**L'EGGS PRODUCTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 86-05-00644.**

United States Court of International Trade.

Jan. 12, 1989.

Stein Shostak Shostak & O'Hara (S. Richard Shostak on the brief and at oral argument and Robert Glenn White, Los Angeles, Cal., on the brief), for plaintiff.

John R. Bolton, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, New York City, (Michael T. Ambrosino, Port Washington, N.Y., on the brief and at oral argument) and (Ted Y. Chong, United States Customs Service, New York City, of counsel), for defendant.

### MEMORANDUM OPINION AND ORDER

RE, Chief Judge:

The question presented in this case is whether knit tubes or leg blank portions of pantyhose manufactured by plaintiff, L'eggs Products, Inc., and imported into the United States from Colombia, are entitled to a duty allowance under item 807.00, of the Tariff Schedules of the United States (TSUS).

The components of the pantyhose, which consist of the sewing yarn or thread, the gusset, the garment labels, the two tubes (with open tube ends), and the plastic bags and stickers, were all products of the United States exported to Colombia for assembly. When the articles were imported into the United States, they were classified for customs purposes under item 384.86, TSUS, as "[o]ther women's, girls', or infants' wearing apparel, not ornamented ... [o]f man-made fibers," with duty at 23.6 percent *ad valorem* plus $0.10 per pound. Plaintiff received an allowance under item

807.00, TSUS, for the cost of the sewing yarn or thread, gussets, garment labels, plastic bags, and stickers. No allowance, however, was made for the cost of the tubes. The Customs Service determined that the closing operation performed on the tubes in Colombia was a further fabrication, and that it was not an assembly process or a process incidental to assembly.

Plaintiff does not dispute the classification, but challenges the refusal of the Customs Service to make an allowance for the cost or value of the tubes under item 807.-00, TSUS.

Item 807.00, TSUS, pursuant to which the allowance is claimed, provides:

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting....
>
> A duty upon the full value of the imported article, less the cost or value of such products of the United States ...

It is not questioned that all three parts of item 807.00 must be satisfied before a component may receive a duty allowance. *See Zwicker Knitting Mills v. United States*, 82 Cust.Ct. 34, 36, C.D. 4786, 469 F.Supp. 727, 729 (1979), *aff'd*, 67 CCPA 37, C.A.D. 1240, 613 F.2d 295 (1980). As section (b) of item 807.00 is not in dispute, the question is whether Customs was correct in denying an 807.00 allowance to the tubes because, in its view, the merchandise as imported did not satisfy the requirements of sections (a) and (c).

Contending that there are no material issues of fact in dispute, both parties move for summary judgment pursuant to Rule 56 of the Rules of this Court. Upon examining the tariff schedules, relevant case law, the merchandise, and supporting pa-

pers, the court concludes that there are no material issues of fact in dispute, and that the Customs Service erred in denying the prescribed duty allowance for the tubes under item 807.00, TSUS. Hence, plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is denied.

In deciding cross-motions for summary judgment, it is fundamental that "the court must determine if there exist any genuine issues of material fact and, if there are none, decide whether either party has demonstrated its entitlement to judgment as a matter of law." *American Motorist Ins. Co. v. United States*, 5 CIT 33, 36 (1983) [1983 WL 4994]. It is also basic that "the court cannot try issues of fact on a summary judgment motion, it can only determine whether there are factual issues to be tried." *Yamaha Int'l Corp. v. United States*, 3 CIT 108, 109 (1982) [1982 WL 2221]. Furthermore the Supreme Court has stated that "the mere existence of *some* alleged factual dispute ... will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

In support of its motion, plaintiff stresses that the tubes "at the time of their exportation, for assembly abroad, place them comfortably within controlling definitions of 'fabricated components.... ready for assembly without further fabrication' as required by item 807.00(a), TSUS." The plaintiff submits that the "sewing closed" of the tubes is a conspicuous example of an "assembly process." Alternatively, plaintiff states that the "sewing closed" of the tubes, "whether measured by time, cost, or technique is in any event an operation that is certainly incidental to complete the pantyhose assembly process." Consequently, the plaintiff contends that the tubes are entitled to a duty allowance because they fulfill the three requirements of item 807.00, TSUS.

Defendant opposes plaintiff's motion and maintains that the tubes, as exported to Colombia, "are incomplete in that the toes had not yet been constructed." Hence, the defendant contends that the tube or "toe closing" operation was a "further fabrication necessary to complete or finish the tubes." The defendant also maintains that the tube closing operation is not an assembly operation because assembly means the joining of two or more separate components, rather than the completion of a single component, i.e., the tube. Finally, the defendant contends that the tube closing process is "unrelated to the assembly of the other exported components," and, therefore, is not an incidental process of the assembly. Hence, the defendant contends that the tubes do not fulfill the requirements of sections (a) and (c) of item 807.00, TSUS, and, consequently, do not qualify for an allowance.

█ It is evident from the submissions that there is no material issue of fact in dispute. What is at issue is whether the knit tubes or leg blank portions of the merchandise meet the requirements of sections (a) and (c) of item 807.00, TSUS. This issue is a question of law and not an issue of fact. As with other statutory provisions, it is the function of the court to interpret the tariff schedules in a manner that will carry out the intent of Congress. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed. 2d 694 (1984); *Sandoz Chem. Works, Inc. v. United States*, 43 CCPA 152, 156, C.A.D. 623 (1956).

The procedure or steps required in the production of the merchandise in issue were described in the affidavits of several persons associated with plaintiff, which were submitted with plaintiff's motion for summary judgment.

█ These affidavits indicate that it was plaintiff's usual procedure to accomplish all the knitting and dyeing in the United States, and then send the components, including the tubes, gussets, sewing yarn or thread, and labels, to Colombia for assembly. Until 1985, the tubes which were as-

sembled for return to the United States, were sent to Colombia with the tube ends closed because Customs would not accord an item 807.00 allowance to the tubes. Nonetheless, in 1985, plaintiff determined it would be less costly and more labor efficient to have the ends of the tubes also closed in Colombia. Thus, in order to resolve the question of whether the sewing of the tubes was permissible under item 807.00, plaintiff decided to send twelve dozen pairs of pantyhose to Colombia with open toes as part of a special "test shipment."

In all shipments but the test shipment, an item 807.00 allowance was extended to all United States components. No allowance, however, was made for the tubes closed in Colombia on the test shipment, and this action followed.

The tubes produced by plaintiff for use in pantyhose are constructed in the United States using a different machine and thread than is used to sew the components into pantyhose. The tubes are knit on a four inch diameter circular 1200 R.p.m. knitting machine using a 40 denier spandex yarn covered at the rate of 34 wraps per inch with a 20 denier 8–ply nylon yarn. The knitting machine knits tuck stitches in the last 16 courses of the tubes to prevent unraveling. The tubes are then dyed to the desired color.

The tubes are sewn together in pairs along with a gusset, which is a small piece of material inserted into the merchandise to improve the fit and for reinforcement. This sewing procedure, which forms the upper portion of the pantyhose, is performed using a 6500 R.p.m. "overedge" sewing machine, which also trims the fabric in the sewing seams. The tube ends are sewn together using the same sewing machine and thread. Each tube is turned inside out, and then the sewing machine operator aligns the tube ends and sews them together. It is important to note that, although the supporting papers speak of a toe end closing, the procedure is more accurately described as a tube end closing, since the open ended tubes have no toe shape or structure.

Plaintiff introduced, as an exhibit, a video tape of the pantyhose assembly operation. It also introduced into evidence samples of the pantyhose before the tube closing operation, and samples after the tube closing process, as imported into the United States.

The initial question, in determining whether the tubes comply with the requirements of item 807.00(a), TSUS, is whether the tube closing operation performed in Colombia constituted a "further fabrication." It is not questioned that "if there was a 'further fabrication,' the [tubes] ... do not meet the statutory requirements of clause (a) of item 807.00, TSUS." *Zwicker*, 82 Cust.Ct. at 38, 469 F.Supp. at 730.

Plaintiff stresses that the tubes, at the time of their exportation, were fully knit and prevented from unraveling by tuck stitches, and, therefore, no further fabrication of any kind was necessary to form the tubes. Hence, the leg tubes were fully fabricated components ready for assembly into pantyhose. Furthermore, plaintiff contends that "the mere process of sewing the tubes closed using the same sewing machine and sewing thread used in the assembly of the upper portion of the pantyhose cannot constitute a further fabrication of the merchandise."

Defendant contends that the tubes were not "exported in a condition ready for assembly without further fabrication." According to defendant, the tube or toe closing operation was fabrication rather than assembly "because it constructed a portion of the pantyhose that did not exist before, namely the toes."

A case which presents a thorough discussion of what constitutes a further fabrication is *Zwicker Knitting Mills v. United States*, 82 Cust.Ct. 34, C.D. 4786, 469 F.Supp. 727 (1979), *aff'd*, 67 CCPA 37, C.A.D. 1240, 613 F.2d 295 (1980). In *Zwicker* it was stated that "there is no one, all-embracing definition of what steps or processes constitute a 'further fabrication' within the meaning of item 807.00, TSUS. Whether a particular process constitutes a 'further fabrication' depends upon the facts of the particular case." *Zwicker*, 82

Cust.Ct. at 39, 469 F.Supp. at 730. The court in *Procter & Gamble Distrib. Co. v. United States*, 11 CIT —, Slip Op. 87–72, at 4 (June 24, 1987) [1987 WL 13264], also observed that "the sewing and knitting cases seem to indicate that such operations are fabrications only if they create the basic article."

The question presented in *Zwicker* was whether certain imported knit glove shells were entitled to a duty allowance under item 807.00, TSUS. More specifically, the issue was whether the procedure by which the fingers of the gloves were closed constituted an assembly, or a further fabrication. In that case, the machines used to knit the gloves in the United States could not complete the fingertips of the glove shells. Thus, the open-fingered glove shells, precut palms, and a separate piece of yarn were sent to Haiti. There, the knitting process was completed and the glove fingers were closed or "tipped." The trial court described the tipping operation as follows:

In the first step in the "tipping" operation, the yarn "floats," which are continuations of yarn between the open fingertip and base of the finger, were cut at the base of the finger. The glove finger was placed over a metal post large enough to fill a glove finger. The top row of the knitted loops was unraveled to expose new, clear loops. A dulled needle was threaded with the yarn "float" and passed through the row of loops on one side of the fingertip. The needle and yarn were pulled through, the glove was turned on the post and the needle and yarn pulled through the loops on the other side of the fingertip. The top rows of stitches on each side were pulled together by stitches across the top of the fingertip about three-quarters of the way across before three tacking or stay stitches were made. On the fourth tacking or stay stitch, the needle was brought down inside the finger and out. The yarn was then trimmed. This process was repeated for each of the five fingertips of the knitted glove shells.

*Zwicker*, 82 Cust.Ct. at 37–38, 469 F.Supp. at 729–30.

The trial court in *Zwicker* determined that the tipping procedure was "clearly a 'further fabrication' because it actually *constructs* a portion of the glove that did not exist before, namely the fingertips." *Id.* at 41, 469 F.Supp. at 732 (emphasis in original). The trial court found that the tipping operation had to be completed after the knitting of the glove shell "since without the 'tipping' the yarn would unravel during the brushing and steaming steps." *Id.* at 41, 469 F.Supp. at 733.

An important or crucial element of the holding of *Zwicker* was that the "tipping operation" of the glove shells required a significant amount of labor. As the trial court explained:

> [T]he only hand labor required in the manufacturing process in the United States was cutting and separating the knit glove shells as they came off the knitting machines. When the knit glove shells were exported from the United States, they were knit only to the extent that the knitting machines were capable of knitting on these particular styles. They were not in fact completely knit. It was left to the *intensive labor*, by hand, in Haiti to finish the fabrication process commenced in the United States.

*Id.* at 41, 469 F.Supp. at 732 (emphasis added).

The Court of Customs and Patent Appeals affirmed the decision of the *Zwicker* trial court and specifically stated that the condition of the glove shells as exported to Haiti was unfinished. *Zwicker*, 67 CCPA 37, 40, 613 F.2d 295, 297. The court stated that "[s]ince only two of the three stages in the knitting process were performed in the United States prior to exportation, we conclude that the glove shells were unfinished when they left the United States." *Id.*

In contrast, the tubes in this case were not unfinished but were "fully fabricated." There was no further weaving or knitting required prior to assembly, and there was only some trimming of a small amount of fabric from the seam. Unlike *Zwicker*, which required the construction of the fin-

gertips, here, no new portion of the tube was constructed or "fabricated" by the operation. The defendant argues that the tubes in this case are "incomplete in that the toes have not yet been constructed," and that the tube closing is a further fabrication because it "completes the pantyhose rather than merely being part of the assembly."

It is to be noted that item 807.00, TSUS, speaks of fabricated components in a "condition ready for assembly without further fabrication." The tubes in question required no further fabrication since they were fully constructed, and were secure from unraveling by the tuck stitches. The defendant, nonetheless, argues that the tube or toe closing operation "created a new portion of the pantyhose, the toes." This assertion, however, is incorrect, since an examination of the merchandise shows that no toe or toe portion is created or constructed. The tubes are merely sewn closed at the ends, and have no foot or toe shape or structure. The tube closing process merely prepares the pantyhose for use, and the tubes do not acquire a foot or toe shape until worn.

Furthermore, unlike the operations performed on the knit glove shells in *Zwicker*, the tube end closing operation does not require a significant amount of labor. In *Zwicker*, the tipping operation performed abroad "required half as much time as the knitting of the entire glove shell," and the cost of the tipping operation was greater than the cost of the knitting operation of the entire glove shell. *See Zwicker*, 82 Cust.Ct. at 42, 469 F.Supp. at 733. In contrast, the only work performed abroad on the tubes is "sewing them closed using the same sewing machines and sewing thread used in the assembly of the upper portion of the pantyhose."

As stated in the affidavit of Mr. Herve Roche, international manager for plaintiff, the actual sewing time to close the tubes is 1.4 seconds. Mr. Roche adds that "when the handling time is added to the actual sewing time, the sewing closed ranged from 13.6 percent to 16.6 percent of the total time then expended in Colombia to

complete a pair of pantyhose." According to Mr. Roche, the total tube end closing process amounted to "less than 2 percent of the total time."

On the question of the cost of the tube end closing operation the affidavit of Mr. August Pike, director of industrial engineering for plaintiff, is enlightening. Mr. Pike states:

In 1984–1985, the cost to sew the tube-ends closed in Colombia was less than 3 percent of the total cost of knitting, sewing, and packaging the pantyhose. The greatest expense in producing a pair of pantyhose is the cost of knitting and dyeing the tubes, which constitutes about 80 percent of the total cost of the pantyhose. The cost of sewing the tube-ends closed is a small portion of the total production cost. Based on current costs for a pair of pantyhose ... the cost of sewing the tube-ends closed in a modern-equipped facility including handling time, is only 1.0 percent of the total cost of the pantyhose.

It is clear, therefore, that the tube closing operation in this case is neither labor intensive nor costly, and is at best a simple operation of a minor nature. In sum, the tube closing consists simply of adding a piece of thread to fabric, a procedure which constitutes less than 2 percent of the total manufacturing process. Hence, it cannot be questioned that the time and cost required to close the tubes was slight compared to the time and cost required for the manufacture and assembly of the entire pantyhose.

The Customs Service, in its determination to deny an 807.00 allowance to the tubes, relied heavily on the *Zwicker* case. *See* Priv.Ltr.Rul. 553105 (Dec. 31, 1984). Previously, the practice of the Customs Service was to grant a duty allowance under 807.00 for tubes which had the tube ends sewn closed abroad. *See* Priv.Ltr. Rul. 041987 (Sept. 19, 1975). The Customs Service, in that ruling stated, "[i]tem 807.-00, TSUS, is not precluded where fabricated components, such as the tubes, are exported and assembled abroad and the toe section of the tubes are sewn closed in

conjunction with the assembly operations." The plaintiff in this case applied for a ruling on the item 807.00 allowance for tubes which had the tube ends sewn closed abroad. In response, the Customs Service, citing the *Zwicker* case, disapproved the 807.00 allowance, thereby reversing its prior position. Priv.Ltr.Rul. 553105 (Dec. 31, 1984). A close reading of *Zwicker*, shows that it is distinguishable from the tube end closing process in the present case, and that it is not authority to prevent an 807.00 allowance for the merchandise in issue.

Defendant's additional contention is that "the toe closing operation does not fall within the meaning of assembly because it does not involve the joining of two separate components but rather the completion of a single component, namely the tube." According to defendant, "[t]he law is clear that assembly requires the joining of two or more solids, parts or pieces."

Judicial and lexicographic definitions of assembly indicate that assembly means to fit or join two or more components or parts. *See Zwicker,* 82 Cust.Ct. at 43–44, 469 F.Supp. at 733–34. Nonetheless, plaintiff asserts that the tube closing operation is an assembly operation rather than further fabrication because there are, in fact, two components, namely, the thread and the fabric.

In support of its contention plaintiff cites the case of *Baylis Bros. Co. v. United States,* 64 Cust.Ct. 256, C.D. 3987 (1970), *aff'd,* 59 CCPA 9, C.A.D. 1026, 451 F.2d 643 (1971), *modified,* 474 F.2d 1026 (1973). In *Baylis* the question presented was whether certain imported dress fronts, which were shirred or smocked outside of the United States, were entitled to a duty allowance under item 807.00, TSUS. The specific issue was whether the smocking operation performed abroad constituted assembly, or further fabrication. The merchandise in *Baylis* consisted of precut dress fronts which were "cut into pieces of a predetermined size and shape, and a design made up of dots was stencilled on the fabric pieces.... The cut and stencilled pieces of fabric ... were exported to Barbados, where the smocking operation took place."

*Baylis,* 59 CCPA at 10, 451 F.2d at 645. Smocking is the process whereby "shirrs" are created by sewing thread through the predetermined stencilled dots to obtain gatherings of material. The smocking did not involve sewing the precut dress fronts to any other piece or pieces of fabric.

The trial court in *Baylis* held that the smocking operation constituted "an assembly within the meaning of item 807.00...." *Baylis,* 64 Cust.Ct. at 260. The court stated that the imported merchandise was a new article different from its two component materials, *"the stencilled dress front and the thread used in making the gathered stitches on the dress front." Id.* (emphasis added). In affirming, the Court of Customs and Patent Appeals stated:

> We agree with the conclusion of the Customs Court in that case [*C.J. Tower & Sons of Buffalo v. United States,* 62 Cust.Ct. 643 (1969)] that 'the term [assembly] is used to describe the joining or coming together of solids.' We find that the smocking operation is well within the common meaning of the term 'assembly,' since the operation merely consists in joining the two components together according to the stenciled designs.

*Baylis,* 59 CCPA at 11, 451 F.2d at 645.

In this case, the defendant asserts that the addition of thread to a piece of fabric constitutes the completion of a single component not the assembly of two or more components. Yet *Baylis* involved only the addition of thread that was sewn through stencilled dots to obtain gatherings of material or shirrs. The two components in *Baylis* were the fabric and the thread. These are precisely the same components used in this case.

Although not cited by the parties, the court has found a Customs Service decision which concluded that "the mere joining of a component to itself does not constitute an assembly for purposes of item 807.00, TSUS." C.S.D. 84–106, 18 Cust. B. & Dec. 1090 (May 15, 1984). The merchandise involved in that ruling was glove shells which were fabricated in the United States and sent abroad where the top two inch portion of the wrist end of the glove shell was turned inside the glove shell and the edge sewn to it. The ruling states that "[t]he material utilized to accomplish the joinder ... is not considered to be a fabricated component. Accordingly, ... where a piece of fabric is folded and sewn or otherwise fastened to itself, there is only a single component involved and, therefore, the joinder cannot be considered an assembly of two or more components, as required by the statute." 18 Cust. B. & Dec. at 1091. The Customs Service in that ruling also stated that although *Baylis* appeared to conflict with its view, *Baylis* was distinguishable. According to the Customs Service, the thread in *Baylis* "acts as more than a simple binding agent," since "by putting the thread through the stenciled holes and gathering the fabric, an elasticity is produced which allow[s] the dress to contract or expand." *Id.* at 1092.

The cited Customs Service ruling, however, misreads *Baylis,* as the court in *Baylis* does not discuss the purpose of the thread in determining whether it is a component. The Court of Customs and Patent Appeals in *Baylis* did not state that the thread must have a function other than as a joining agent, but, rather, clearly held that the thread was a component in addition to the fabric. In affirming the holding of the Customs Court, which granted the 807.00 allowance, the appellate court stated that, "the smocking operation is well within the common meaning of the term assembly, since the operation merely consists in joining the two components together...." *Baylis,* 59 CCPA at 11, 451 F.2d at 645.

■ Moreover, it is axiomatic that when a tariff statute has been construed by the court, it is the judicial decision and not the administrative practice which is controlling. Therefore, in view of the precedent in *Baylis,* that thread is a component, the cited Customs Service ruling is neither binding nor persuasive. *See The Ferriswheel v. United States,* 84 Cust.Ct. 61, 69, C.D. 4844, 489 F.Supp. 263, 268 (1980), *aff'd,* 68 CCPA 21, C.A.D. 1260, 644 F.2d 865 (1981).

To argue that the joining of a component to itself with thread is not an "assembly" is

contrary to the holding in *Baylis*. The trial court in *Zwicker*, in describing the smocking process in *Baylis* stated that, "[t]he smocking did not involve sewing the precut dress fronts onto other pieces of fabric, but rather the sewing *gathered the fabric of the dress front to itself to create the shirrs.*" *See Zwicker*, 82 Cust.Ct. at 44, 469 F.Supp. at 734 (emphasis added). The thread in *Baylis* was the joining agent which joined the fabric of the dress front to itself at predetermined points. In the present case, the thread joins the tube to itself by sewing the tube ends closed. As in *Baylis*, the thread is a component which serves as the joining agent. Since the tube closing operation joined two components together, namely thread and fabric, it is an "assembly" as the term was applied in *Baylis*.

Additionally, defendant cites *Surgikos, Inc. v. United States*, 12 CIT ——, Slip Op. 88–35, at 4 (March 18, 1988) [1988 WL 24664], to support its contention that the joining of an article to itself is not assembly. *Surgikos*, however, is clearly distinguishable from the present case. In *Surgikos*, this court held that finish folding or the folding in a specific way of surgical sheets was not an operation "incidental to the assembly process." The court, however, did not discuss the joining of a component to itself, since no binding or joining is involved in a folding process. Hence, a case which deals with a folding process is not pertinent, and cannot affect the precedential value of the holding in *Baylis*.

In summary, in *Zwicker*, the glove shells did not become a fabricated component "in a condition ready for assembly" until after the fingertips had been constructed. *Zwicker*, 82 Cust.Ct. at 45, 469 F.Supp. at 734–35. Here, as in the dress fronts in *Baylis*, the tubes were completely fabricated when the closing operation took place. Hence, since both here and in *Baylis* no further knitting was required and no new portion of the merchandise was constructed, *Baylis* is a controlling precedent.

In order to qualify for item 807.00 treatment, clause (c) requires that the articles "have not been advanced in value or improved in a condition abroad except by being assembled and except by operations incidental to the assembly process ..." " [I]tem 807.00 logically assumes that there has been an advancement in value or improvement in condition of the article, and provided it is solely by virtue of the act of assembly" the merchandise may be accorded the statute's duty allowance. *See Carter Footwear, Inc. v. United States*, 11 CIT ——, ——, 669 F.Supp. 439, 444 (1987). Since the court holds that the tube closing operation is not further fabrication and is part of the assembly pursuant to item 807.-00, TSUS, the merchandise has "not been advanced in value or improved in condition abroad except by being assembled ..." thus, satisfying clause (c) of item 807.00. Hence, it is not necessary for the court to address the contentions of the parties as to whether the tube closing operation is "incidental to the assembly process ..." *See* item 807.00, TSUS; *see also Carter Footwear*, at ——, 669 F.Supp. at 445.

Upon all the evidence of record, it is the determination of the court that the plaintiff has succeeded in rebutting the statutory presumption of correctness. 28 U.S.C. § 2639(a)(1) (1982). Having succeeded in establishing compliance with the requirements stated in clauses (a) and (c), plaintiff is entitled to the duty allowance claimed under item 807.00, TSUS, for the knit tubes or leg blank portions of the pantyhose in issue. Therefore, plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment is denied. Judgment will issue accordingly.