PEG BANDAGE, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 87–12–01184 and 87–12–01184–S

(Dated December 15, 1993)

*Rode & Qualey, (John S. Rode* and *R. Brian Burke),* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General, *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, *(Nancy M. Frieden), Steven Berke,* United States Customs Service, of counsel, for defendant.

## MEMORANDUM OPINION

GOLDBERG, *Judge:* Plaintiff contests Customs' classification of elastic bandages under Item 386.50, Tariff Schedules of the United States

("TSUS"). Plaintiff seeks partial duty-free treatment for its imported merchandise under either Item 806.20, or, alternatively, Item 807.00, TSUS. Defendant moves for summary judgment on both of plaintiff's claims. Plaintiff objects, and cross-moves for partial summary judgment seeking an order recognizing that: (1) all of its protests covering the entries at issue in this case were timely filed; and (2) it has satisfied all regulatory requirements for entry under Item 806.20 and Item 807.00, in accordance with Headnote 1, Schedule 8, TSUS.

BACKGROUND

Plaintiff Peg Bandage, Inc. ("Peg") is a wholly-owned subsidiary of Becton Dickinson, Inc., and is the manufacturer and importer of elastic "ACE" and ACE-type bandages. These bandages consist of woven cotton or polyester yarns covering elastic fibers of spandex or rubber.

Production of the elastic bandages at issue in this case began at Peg's facility in Puerto Rico, where the initial processing included: winding (the transfer of yarn from cones to spools); covering (surrounding continuous spandex or rubber elastic fibers with cotton or polyester thread); warping (the transfer of covered material to warp beams [i.e. large spools]); weaving (the transfer of material to weaving machines, where it is woven together to create bandages); dyeing (with a coloring and softening solution); and cutting to length. Consolidated and Amended Complaint ("Complaint") paragraph 5. At this point Peg exported the unsewn bandages to Haiti, where the ends were sewn to prevent unraveling. The sewn bandages were then rolled and clipped; some were marked with the ACE logo and other information, while others were shrink-wrapped in cellophane. The finished bandages were then shipped to U.S. Customs territory. Complaint paragraph 7.

On May 27, 1983, Peg filed with the U.S. Customs Service ("Customs") a request for a ruling on the tariff classification of the imported bandages, contending that the merchandise was appropriately classified under Item 806.20, TSUS. On September 9, 1983, Customs Ruled that the elastic bandages did not meet the requirements of 806.20 classification; instead, it held that polyester-based bandages were properly classified under Item 389.62, TSUS, and that cotton-based bandages were properly classified under Item 386.50, TSUS. On July 13, 1984, Peg filed a request for reconsideration of this ruling. Customs denied this request on June 3, 1985. Complaint paragraphs 11–13. As a result, Peg filed five protests covering Customs' classification of thirty-one separate entries of elastic bandages under Item 386.50, TSUS.[1] Complaint paragraph 14. These entries occurred between January 1984 and July 1985.[2] Each of Peg's protests sought Item 806.20 treatment for the imported bandages, and each was denied. Complaint paragraphs 18–19.

---

[1] Protest numbers 4909–4–000084 and 4909–4–000085 were filed on August 23, 1984; protest number 4904–4–000244 was filed on December 6, 1984; protest number 4909–7–000100 was filed on September 2, 1987; protest number 4909–89–000037 was filed on March 28, 1989. Complaint paragraphs 15–17.

[2] Plaintiff's Memorandum in Opposition to the Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment ("Pl.'s Brief"), Exhibit F.

Peg then filed three summonses contesting Customs' denial of its five protests.[3] Complaint paragraph 20. These three actions were subsequently consolidated by order of this court. *Peg Bandage, Inc. v. United States,* 16 CIT 319, Slip. Op. 92–63 (May 5, 1992).

## DISCUSSION

Summary judgment is warranted when, based upon the "pleadings, depositions, answers to interrogatories, * * * admissions on file, * * * [and] affidavits, if any," the court concludes that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Rule 56(d), Rules of the Court of International Trade. The mere existence of some factual disputes will not defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). In order to succeed, the party opposing summary judgment must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)); *International Cargo & Sur. Ins. Co. v. United States,* 15 CIT 541, 542–43, 779 F. Supp. 174, 176 (1991). In contrast, the burden on the moving party "may be discharged by * * * pointing out to the [court] that there is an absence of evidence to support the [opposing] party's case." *Celotex,* 477 U.S. at 325; *see Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed. Cir. 1987). Customs' classification is presumed to be correct, and the burden of proving otherwise rests with the party challenging that decision. 28 U.S.C. § 2639(a) (1) (1988).

Peg can defeat the government's motion for summary judgment by showing there are genuine issues of material fact regarding the proper classification of its elastic bandages under the TSUS. Alternatively, in the absence of genuine issues of material fact, the government's motion can be denied if, on the evidence presented, the court deems that Peg is entitled to judgment as a matter of law. Though the government is entitled to its presumption, this court must independently verify the correctness of Customs' classification. *Jarvis Clark Co. v. United States,* 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). Furthermore, despite Peg's failure to cross-move for summary judgment on either of its proposed classifications, the court may nevertheless enter judgment in Peg's favor *sua sponte.* The only prerequisite to entering judgment in favor of a party *sua sponte* is that the losing party be on notice that it need present all of its evidence regarding the issue(s) disposed of via summary disposition. *Celotex,* 477 U.S. at 326.

A motion for summary judgment is essentially a two-part statement by the moving party, that, as to those claim(s) addressed in its motion: (1) there are no triable issues involved; and (2) the moving party is entitled to judgment as a matter of law. The moving party is necessarily

---

[3] *Peg Bandage, Inc. v. United States,* No. 87–12–01184, contests Customs' denial of protest numbers 4909–4–000084 and 4909–4–000085; *Peg Bandage, Inc. v. United States,* No. 89–10–00552, contests Customs' denial of protest numbers 4904–4–000244 and 4909–7–000100; *Peg Bandage, Inc. v. United States,* No. 90–02–00072, contests Customs' denial of protest number 4909–89–000037.

afforded an opportunity to present all of its evidence in order to establish a complete lack of evidentiary support for the contrary position taken by the opposing party; indeed, this is the burden the moving party must meet in order to succeed on its motion. By moving for summary disposition, therefore, a party is afforded the requisite notice which enables a court to enter judgment in favor of the non-moving party *sua sponte* on those claim(s) raised in the summary judgment motion. *See Celotex*, 477 U.S. at 326.

## A. JURISDICTION

Peg contests Customs' denial of its protests pursuant to 19 U.S.C. § 1515 (1988). The court's jurisdiction is based upon 28 U.S.C. § 1581(a) (1988). In order for the court to properly exercise jurisdiction over a protest denied, that protest must have been filed within ninety days after, but not before, notice of liquidation or reliquidation. 19 U.S.C. § 1514(c) (2) (A) (1988). This requirement is strictly construed. *Atari Caribe v. United States,* 16 CIT 588, 589, 799 F. Supp. 99, 102 (1992). Notice of liquidation is made via a bulletin notice that is posted in the customhouse at the place of entry; such notice is deemed dated as of the date of posting. 19 C.F.R. § 159.9.

As an initial matter, Peg argues that because the government failed to raise the issue of untimely protests in its Memorandum of Law in Support of the Government's Motion for Summary Judgment, the government conceded this argument and is thus estopped from subsequently raising it as a defense. This position is simply untenable. Objections to the court's jurisdiction may be raised at any time during the pendency of the action. *Schering Corp. v. United States,* 67 CCPA 83, 88, 626 F.2d 162, 167 (1980). Once raised, the burden shifts to the opposing party to show by competent proof that jurisdiction exists. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936).

Peg also submits notices of denial of its protests in support of its cross motion. These notices indicate that the District Director of Customs in San Juan, Puerto Rico, denied Peg's protests on their merits, and not on the basis of untimeliness. As a result, Peg argues that the presumption of regularity that attaches to the performance of official acts supports the conclusion that these records, which existed at the time the protests were processed, establish their timeliness as to all entries. The court recognizes that public officials are presumed to perform their duties in the manner required of them by law. *Olavarria & Co. v. United States,* 47 CCPA 65, 66 (1960). This presumption, however, is insufficient support for Peg's conclusion in light of additional evidence to the contrary. The regulation specify that only posted bulletin notices constitute legal evidence of liquidations. 19 C.F.R. § 159.9(c), (d). Thus, the court must examine Customs' records of bulletin postings for disposition of this issue.

The government concedes that Customs has destroyed all bulletin notices of liquidation covering the entries in this case. Nevertheless, the

government asserts two jurisdictional defenses. First, the government argues that protest no. 4909–7–000100, filed on September 2, 1987, is premature as to entry nos. 84–449275–1 and 85–565749–1. Peg submits courtesy notices of liquidation to establish that Customs gave written notice that these entries were *scheduled* for liquidation on July 17, 1987, and June 26, 1987, respectively. Pl.'s Brief, Exhibit A. In response, the government submits the affidavit of Joseph A. DiSalvo, a Supervisory Customs Liquidator. The DiSalvo affidavit refers to computer printouts from Customs' Automated Commercial System ("ACS") database. The ACS records indicate that entry no. 84–449275–1 was first liquidated on April 15, 1988, while entry no. 85–565749–1 was liquidated on September 30, 1988.

According to Mr. DiSalvo, Customs will occasionally decide not to liquidate an entry that has been scheduled for liquidation; rather, the liquidation will be "unset" *(i.e.* unscheduled). DiSalvo Affidavit paragraphs 8, 12. The ACS database was coded in such a manner as to not allow the unsetting of a liquidation on or after the scheduled posting date. *Id.* Paragraph 8. Because Customs mails a courtesy notice of liquidation approximately two weeks prior to the bulletin's scheduled posting date, it is possible that a liquidation may be unset prior to posting of the bulletin but after the courtesy notice is mailed. *Id.* Paragraph 12. Upon posting of the bulletin notice, Customs records the liquidation date in its ACS entry Archive File. *Id.* Paragraph 7.

Peg has failed to establish the timeliness of its protests as to entry nos. 84–449275–1 and 85–565749–1. Courtesy notice is not indispensable to liquidation, nor is it recognized as legal proof of liquidation. 19 C.F.R. § 159.9(c). Courtesy notice is merely intended to inform the importer that liquidation is imminent. As the government explains, liquidations may occasionally be postponed beyond the date specified in a courtesy notice. Thus, such notice does not conclusively establish the date of liquidation; this is especially so where, as here, Customs' records indicate that the requisite bulletin notice was actually posted on a later date. *See Goldhofer Fahrzeugwerk GmbH & Co. v. United States,* 13 CIT 54, 57–58, 706 F. Supp. 892, 895, *aff'd,* 7 Fed. Cir. (T) 148, 885 F.2d 858 (1989). Moreover, the government is accorded a presumption of regularity that attaches to Customs' recordkeeping. *See Kalvar Corp. v. United States,* 543 F.2d 1298, 1301–02 (Ct. Cl. 1976). The ACS files indicate that Peg's protest was filed prior to the recorded liquidation dates of these two entries. Liquidation is legally defined to occur upon the posting of bulletin notice, and Customs is presumed to record liquidation dates in accordance with this definition. Peg's courtesy notices are insufficient to rebut this presumption. Because the protest covering these two entries was filed prior to their recorded liquidation, entry nos. 84–449275–1 and 85–565749–1 must be severed from his action and dismissed for lack of jurisdiction.

The government also argues that protest no. 4909–89–000037 was filed more than ninety days after liquidation of the elastic bandages that

comprised a portion of each of the underlying entries,[4] and is thus untimely under 19 U.S.C. 1514(c) (2). The six entries covered by this protest were initially liquidated between September 23, 1988 and November 14, 1988. Each of these entries included quantities of belts in addition to elastic bandages. On December 30, 1988, five of the six entries were reliquidated to reflect a change in Customs' assessment of belts from Item 389.40 to Item 389.62, TSUS; the sixth entry was reliquidated on January 9, 1989, to reflect the same change. In all cases, the duty assessed upon the imported bandages remained unchanged after reliquidation. Protest no. 4909–89–000037 was filed on March 28, 1989.

Customs may reliquidate entries on its own initiative within ninety days of the initial liquidation. 19 U.S.C. § 1501 (1988); 19 C.F.R. § 173.3(a). Parties to that decision are afforded ninety days from the date of reliquidation to file a protest. 19 U.S.C. § 1514(c)(2). The right to protest a reliquidation, however, is expressly limited. Reliquidation does not open the affected entry to permit the filing of a protest that contests issues that were not specifically addressed in the reliquidation. 19 U.S.C. § 1514(d). Thus, classification decisions that are not considered during reliquidation are measured from the date of original liquidation for purposes of 19 U.S.C. § 1514(c) (2). It is clear from the record that Customs reliquidated the instant entries only with regard to the proper classification of belts; liquidation of the elastic bandages remained unaffected. Because its protest was filed more than ninety days after liquidation of the elastic bandages contained in the underlying entries, the court lacks jurisdiction to entertain Peg's claim contesting Customs' denial of protest no. 4909–89–000037. As a result, entry nos. 85–530618–2; 85–530648–3; 85–530823–2; 85–531235–4; 85–531767–6; and 85–530503–1 must be severed from this action and dismissed for lack of jurisdiction.

### B. REGULATORY REQUIREMENTS

Peg moves for an order of summary judgment recognizing that it has satisfied the conditions and requirements of all applicable regulations for entry under Item 806.20, TSUS, and Item 807.00, TSUS, in accordance with Headnote 1, Schedule 8, TSUS. This headnote provides that any article that is described in any provision of Schedule 8 is classifiable under that provision "if the conditions and requirements thereof and of any applicable regulations are met." The documentary requirements for entry under Item 806.20, TSUS, and 807.00, TSUS, are respectively found in 19 C.F.R. §§ 10.8 and 10.24 (1985). Although Customs allowed Peg to enter its initial entries of elastic bandages under Item 806.20, TSUS, all subsequent entries were required to be entered under Item 386.50, TSUS. As a result, submission of Schedule 8 duty-reduction documents would have been futile. Peg nevertheless continued to accumulate the requisite documentation, which it now submits to the court

---

[4] Protest no. 4909–89–000037 covers entry nos. 85–530618–2; 85–530648–3; 85–530823–2; 85–531235–4; 85–531767–6; and 85–530503–1.

in support of its motion. In its response, the government concedes that Peg has satisfied the requirements of 19 C.F.R. §§ 10.8 and 10.24 for entry under Items 806.20 and 807.00, TSUS. The court agrees; as to this issue, Peg's motion is granted.

## C. ITEM 806.20, TSUS, CLASSIFICATION

Customs liquidated the imported bandages under Item 386.50, TSUS.[5] Under this provision a duty is assessed upon the entire value of the imported merchandise. Peg argues first that its elastic bandages are properly classified under Item 806.20, TSUS, as articles exported for repairs or alterations; under this provision the duty rate applicable to the article is assessed only upon the value of the alterations or repairs performed abroad. Peg bases its argument on its insistence that the processing performed in Haiti is properly characterized as a mere "finishing" operation. Accordingly, Peg recognizes that its elastic bandages are dutiable at the rate specified in Item 386.50, but insists that such duty may be assessed only upon the value of the work performed in Haiti. *See* Headnote 2, Part 1, subpart B, Schedule 8, TSUS (1985). The government responds by asserting that the Haiti operations do not meet well-settled criteria for treatment as "repairs or alterations," but are properly considered an essential step in the manufacturing process. Resolution of this dispute depends upon judicial interpretation of the term "alteration" as it is used in the tariff schedules, and upon whether the bandages, as exported from Puerto Rico to Haiti, were suitable for their intended use. Despite Peg's protestations to the contrary, it is evident from the submissions that there are no genuine issues of material fact. As a result, Peg's claim is susceptible of summary disposition. *See, e.g., Lynteg, Inc. v. United States,* 10 Fed. Cir. (T) ____, ____, 976 F.2d 693, 695–96 (1992).

The term "alteration," as it was used in the predecessor to Item 806.20, TSUS, was analyzed by the Court of Customs and Patent Appeals in *United States v. J.D. Richardson Co.,* 36 CCPA 15 (1948).[6] In *Richardson,* metal rims were exported from Detroit, Michigan to Windsor, Canada, where they were flanged in accordance with specifications provided by the United States Army. The rims were used exclusively as finished parts in the assembly of idler wheels for the T–26 tank. Unflanged rims could not be employed for this purpose. *See Richardson,* 36 CCPA at 16. Because unflanged rims were unsuitable for their intended use, as described in the Army's specifications, the court concluded that the exported rims were in an "unfinished" condition. The court found that Congress intended to limit the preferential tariff treatment accorded articles exported for alterations; only those articles exported in a "finished" condition were eligible for such treatment. *Id.* at 18. The

---

[5] This provision covers: Articles not specially provided for, of textile materials, not ornamented, of cotton, other. In 1984 the duty rate for Item 386.50, TSUS, was 10.5% *ad valorem.* In 1985 this rate was reduced to 9.3% *ad valorem.*

[6] Paragraph 1615 of the Tariff Act of 1930 was amended by paragraph 1615(g) of the Customs Administrative Act of June 25, 1938, to provide that duties on articles exported from the United States for alterations or repairs were to be assessed only upon the value of such foreign alterations or repairs. *Richardson,* 36 CCPA at 16–17.

court refused to accord the flanged rims preferential treatment, because flanging was a necessary step in the manufacture of the completed article. *Id.* at 18–19. *Richardson* thus offers three relevant points: (1) exported articles that are not yet suitable for their intended use are unfinished; (2) product specifications provide an excellent indication of a product's intended use; and, (3) foreign processing of unfinished articles exported from the United States is not properly considered an "alteration" within the meaning of the Tariff Act of 1930.

The Court of Customs and Patent Appeals reaffirmed the *Richardson* rationale in the context of Item 806.20, TSUS, in *Dolliff & Co. v. United States,* 66 CCPA 77, 82, 599 F.2d 1015, 1019 (1979). In *Dolliff,* polyester fabrics made in the United States were exported to Canada for further processing and imported back to the United States. The Customs Court had denied Item 806.20 treatment to the imported fabrics. *Dolliff,* 66 CCPA at 79, 599 F.2d at 1017. On appeal, the court held that "repairs and alterations are made to *completed* articles and do not include intermediate processing operations which are performed as a matter of course in the preparation or the manufacture of finished articles." *Id.,* 66 CCPA at 82, 599 F.2d at 1019 (emphasis added). Because the Canadian operations were essential to initial production of the finished fabric, such processing could not qualify as "alterations" within the meaning of Item 806.20. The court therefore affirmed the decision of the Customs Court. *Id.,* 66 CCPA at 83–84, 599 F.2d at 1020–21.

The reasoning employed by the *Richardson* and *Dolliff* courts governs analysis of this issue. In order to decide whether Item 806.20 treatment is appropriate for Peg's bandages, this court must ascertain: (1) the intended use of the bandages; and (2) whether the bandages are suitable for their intended use prior to being exported to Haiti for further processing. The first inquiry must be answered with particular reference to Peg's product specifications. Preferential treatment under Item 806.20 is available only if the second inquiry is answered in the affirmative. *See Guardian Industries Corp. v. United States,* 3 CIT 9, 12–13 (1982).

Peg states that "[t]he elastic bandages in issue are designed and intended to be used for the purpose of providing compressive force to an injured limb or joint of the human body * * * [or] to hold casts or dressings in place during post-surgical care, or to serve as an anti-embolism measure." Pl.'s Br. at 11, 24. Each of these uses depends solely upon the ability of the bandage to bind and compress either the human body itself, or a cast or dressing applied to the human body. Peg's narrow definition is thus satisfied when the bandages are first capable of sustaining the compressive force called for in the product specifications. But Peg's specifications dictate that the bandages' "intended use" must be defined more broadly. Indeed, these specifications offer a comprehensive state-

ment of what Peg demanded of its product.[7] Two provisions are worthy of note: first, the ends of the bandages were required to be sewed to prevent unraveling; and second, the materials used in fabricating the bandages were required to be capable of withstanding repeated washing and autoclaving cycles without injury or loss of elasticity. Pursuant to this second specification, Peg's performance standards mandated rigorous test procedures including laundering and drying procedures. Finally, Peg's quality control specifications included an inspection for defective sewing. The implication of these requirements is clear: Peg's bandages were intended as multiple-use elastic bandages, capable of sustaining intermittent cycles of washing and drying between periods of use.

Peg admits that an unsewn or unsecured bandage will begin to ravel at the ends because "[r]ubber or spandex has a greater capacity to stretch than cotton yarn." Plaintiff's Answers to Defendant's First Interrogatories and Request for Production of Documents at 28. Peg adds that "[u]nless the bandage is secured at its end, the stretched elastic tends to 'shrink' to its original, 'relaxed' position, leaving only cotton thread at the ends. These yarns in turn are more readily unraveled, and the process is accelerated because the greatest stress on a bandage tends to be at its ends." *Id.* Peg also admits that sewing the ends of its bandages specifically prevents such unraveling. Id. The forces exerted by washing and drying an unsewn bandage can only speed the unraveling process, thus limiting the useful lifetime of the bandage. Clearly, then, the sewing process is essential to transforming what is essentially a single-use or limited-use bandage into a reusable bandage.[8] A reusable elastic bandage is simply not complete until the ends are secured against unraveling. Stated another way, an unsewn elastic bandage is plainly unsuitable for use as a commercially acceptable reusable bandage.[9]

Peg's error lies in its narrow view of the product's intended use, a view that is inconsistent with its own specifications. The fact that the sewing process does not influence the ability of the bandage to apply a compressive force is irrelevant-both sewn and unsewn bandages are capable of applying a compressive force, but only sewn or otherwise secured bandages are capable of repeated washings without diminishing their functional ability. Also irrelevant is the fact that hospital staff sometimes cut elastic bandages to shorten their length-once cut the bandage immediately becomes susceptible to unraveling and thus loses its "reusable"

---

[7] Paragraph 2.1 defines the scope of the specifications: "This specification shall provide *the requirements and any other applicable information necessary* to maintain a proper and controlled product." Memorandum of Law in Support of the Government's Motion for Summary Judgment, Exhibit C (emphasis added).

[8] In addition to bandages with sewn ends, Peg also sold self-adhesive bandages; these bandages had a self-adhesive substance applied to their ends to prevent unraveling and to obviate the need for metal clips. *See* Plaintiff's Answers to Defendant's First Interrogatories and Request for Production of Documents at 26–27. Exhibit C to the government's motion for summary judgment contains an advertisement for the Ace self-adhesive bandage that flaunts its reusable quality, in contrast to single-use sports tape. Peg's marketing strategy thus provides additional support for the court's conclusion.

[9] Neither Peg nor Becton Dickinson know of any customers that purchase elastic bandages produced by Peg that do not have the ends secured against unraveling. Plaintiff's Answers to Defendant's First Interrogatories and Request for Production of Documents at 38. Peg is also unaware of any competitors that sell unsewn or unsecured elastic bandages. *See id.* at 40.

quality. In sum, because the unsewn bandages are unsuitable for their intended use as reusable bandages, the sewing operations performed in Haiti are not alterations within the meaning of Item 806.20, TSUS. Classification of the bandages under 806.20 is therefore denied.

### D. Item 807.00, TSUS, Classification

The government also moves for summary judgment denying Peg's claim for Item 807.00 treatment of its bandages. Item 807.00, TSUS, provides that the value of components fabricated within the United States shall be subtracted from the full value of the imported article prior to assessing a duty upon the import. Item 807.00 treatment is predicated upon three specific requirements: (1) the U.S. components must have been exported in a condition ready for assembly without further fabrication; (2) the U.S. components must not have lost their physical identity in such articles by change in form, shape, or otherwise; and (3) the U.S. components must not have been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting. The government urges that summary judgment denying 807.00 treatment is appropriate because the first and third criteria are not met in the present case. Because the court finds there are no genuine issues of material fact, this claim is also susceptible of summary judgment.

1. *Further fabrication:*

The question of what constitutes a "further fabrication" within the meaning of Item 807.00 is made on a case-by-case basis; there is "no one, all-embracing definition." *Zwicker Knitting Mills v. United States,* 82 Cust. Ct. 34, 39, 469 F. Supp. 727, 730 (1979), *aff'd,* 67 CCPA 37, 613 F.2d 295 (1980). *See, e.g., Proctor & Gamble Distributing Co. v. United States,* 11 CIT 450, 452 (1987). Prior caselaw, however, provides some guidance.

In *United States v. Baylis Brothers Co.,* 59 CCPA 9, 451 F.2d 643 (1971), *modified,* 474 F.2d 1026 (1973), dress fronts were exported to be "smocked," and then imported back to the United States. The smocking operation involved sewing thread through pre-stencilled dots on fabric in order to obtain shirrs, *i.e.* gatherings of material. The court held that the process of joining pre-cut and pre-stencilled fabric with thread was an assembly operation; as a result, the court upheld 807 treatment for the merchandise. This holding necessarily implies that not only the pre-cut fabric, but also the thread, were understood to be "fully fabricated" components of the smocked dress fronts.

The Court of Customs and Patent Appeals later addressed *Baylis* in *Zwicker Knitting Mills v. United States,* 67 CCPA 37, 613 F.2d 295 (1980). In *Zwicker,* open-ended glove fingers were exported to Haiti, where the glove fingers were sewn closed by hand. The *Zwicker* court affirmed the Customs Court's denial of 807 treatment for the glove fingers. In so doing, the court stated that the "joinder [in *Zwicker]* is neces-

sary to finish a subcomponent, whereas the [joinder in *Baylis]* involves subcomponents that are already completed." *Zwicker,* 67 CCPA at 41, 613 F.2d at 297. *Zwicker* teaches that only "finished" components or subcomponents are "fully fabricated," and are thus ready for assembly. Foreign operations necessary to finish such components or subcomponents are therefore not "assembly" operations within the meaning of Item 807.

The government argues that because the foreign sewing operation involved in *Zwicker* was necessary to prevent unraveling of the knitted article, the *Zwicker* holding requires this court to find that the sewing performed in Haiti is similarly a finishing operation; this view renders the bandages ineligible for 807 treatment. *Zwicker,* however, does not compel this conclusion. As previously indicated, Peg's product is a reusable elastic bandage comprised of woven elastic fibers and cotton yarns, thread, and packaging materials. In its condition as exported, the unsewn bandage is capable of sustaining a compressive force, albeit for one or a very few number of uses; nevertheless, the unsewn bandage is "finished" as an elastic bandage, just as the pre-cut fabric in *Baylis* was finished as a dress front. When the unsewn bandage is joined with thread, a fully fabricated component under *Baylis,* the result is a *reusable* elastic bandage. Therefore, the sewing performed in Haiti is an assembly operation within the meaning of Item 807, a process of joining two fully fabricated or "finished" components.

The government points out that the first prong of the test for 807 treatment requires that the foreign processing must necessarily or appropriately be deferred until after manufacture of the components, *i.e.* until assembly occurs. *See United States v. Mast Industries, Inc.,* 69 CCPA 47, 50, 668 F.2d 501, 503 (1981) (citing *Mast Industries, Inc. v. United States,* 1 CIT 188, 192–93, 515 F. Supp. 43, 46–47 (1981)); *United States v. Oxford Industries, Inc.,* 69 CCPA 55, 668 F.2d 507 (1981). By restricting the term "assembly" to include only the packaging of the elastic bandages, the government argues that 807 treatment should be withheld because the sewing operation must be performed prior to such assembly. As noted, however, the court deems sewing of the bandage-ends an assembly operation, one that is necessarily deferred until after manufacture of the component unsewn bandage. The government's argument is therefore rejected.

Finally, the government relies upon *L'eggs Products, Inc. v. United States,* 13 CIT 40, 704 F. Supp. 1127 (1989), in support of its motion. In *L'Eggs,* knit tubes used as leg blank portions of pantyhose were exported from the U.S. to Colombia, where the tubes were sewn to create the toe-end closing. Plaintiff argued that the sewing procedure was an assembly operation within the meaning of Item 807, and that the knit tubes were fully fabricated prior to being exported to Colombia. At the time of their exportation the tubes were fully knit. In addition, they were prevented from unraveling by knitting tuck stitches in the last sixteen courses of the tubes; the foreign sewing operation completed the

process of closing the tube-ends. The *L'Eggs* court agreed that the knit tubes were fully fabricated and thus merited 807 treatment.

The government here argues that because the unsewn bandages were in no way processed to prevent their unraveling prior to exportation, they cannot be considered "fully fabricated" within the meaning of Item 807. This argument, however, unduly narrows the proper reading of *L'Eggs*. In distinguishing *Zwicker,* the *L'Eggs* court noted that "[t]here was no further *weaving* or *knitting* [of the leg blanks] required prior to assembly, and there was only some trimming of a small amount of fabric from the seam. Unlike *Zwicker,* which required the *construction* of the fingertips, here, *no new portion of the tube was constructed or 'fabricated' by the operation." L'Eggs,* 13 CIT at 46, 704 F. Supp. at 1131 (emphasis added). Similarly, the sewing operation performed in Haiti does not construct a new portion of the elastic bandage-the bandage ends are created when the woven material is cut in Puerto Rico. Furthermore, the bandages are prevented from unraveling and are closed by means of a single procedure that is unrelated to the initial weaving operation. The contrast between the Puerto Rico and Haiti operations is clear-in Haiti the ends are sewn, not woven; using thread, not elastic fibers or cotton yarn; and, the ends are sewn using a different machine than that used to weave the unsewn bandage. In sum, the fact that the unsewn bandage is not secured against unraveling prior to exportation is not dispositive-what is significant is that no further weaving is required to complete the foreign assembly of the bandage. Peg's process of securing bandage ends is simply not a continuing fabrication; rather, the unsewn bandage is "fully fabricated" within the meaning of Item 807.00, TSUS, prior to exportation. The government's argument is therefore rejected.

### 2. *Assembly or operations incidental to assembly:*

The government argues that should the court conclude that the unsewn bandages were exported in condition ready for assembly, 807 treatment must still be withheld because the third prong of the test is not satisfied. In order to qualify for preferential treatment, subsection 807.00 (c) requires that articles assembled abroad not be advanced in value or improved in condition, except by (1) being assembled; or, (2) operations incidental to assembly. The government focuses exclusively on the latter exception, arguing that the sewing operation performed in Haiti is not "incidental to assembly." Because the court finds that the sewing operation is a part of the assembly operation, it need not address the government's contentions.

The term "assembly" is commonly defined as "'the joining or coming together of solids.'" *Baylis,* 59 CCPA at 11, 451 F.2d at 645. As used in Item 807.00, assembly means the joining or coming together of fully fabricated or "finished" components or subcomponents. *Id.; L'Eggs,* 13 CIT at 49–50, 704 F. Supp. at 1133–34; *Pistorino & Co. v. United States,* 69 Cust. Ct. 93, 98 (1972); *see Oxford Industries,* 69 CCPA at 60, 668 F.2d at 510–11. The court has found that the unsewn bandage was a fully fab-

ricated component of the reusable bandage. The Haiti operation joined this component with another fully fabricated component, *i.e.* sewing thread. The joining of these two finished components amounted to an "assembly" within the meaning of Item 807. Thus, any increase in value or improvement in condition traceable to the sewing performed in Haiti is excepted under 807.00(c). As a result, Peg's bandages qualify for preferential tariff treatment under Item 807.00, TSUS.

CONCLUSION

For the foregoing reasons, entry nos. 84–449275–1; 85–565749–1; 85–530618–2; 85–530648–3; 85–530823–2; 85–531235–4; 85–531767–6; and 85–530503–1 are severed from this consolidated action and designated Court No. 87–12—01184–S, which action is hereby dismissed for lack of jurisdiction. As for the remaining entries, the court concludes that Peg's elastic bandages are eligible for the prescribed duty allowance under Item 807.00, TSUS. Judgment is to be entered for plaintiff.