**C. J. TOWER & SONS OF BUFFALO, INC.**

v.

**UNITED STATES.**

**C.D. 3840; Protest 67/67442–5494.**

United States Customs Court,
Third Division.
June 3, 1969.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel) for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Mollie Strum, New York City, trial attorney), for defendant.

Before RICHARDSON and LANDIS, Judges.

RICHARDSON, Judge:

The merchandise of this protest consists of certain plastic film exported from Canada and entered at Buffalo on September 8, 1966, and classified in liquidation under item 771.42 of the Tariff Schedules of the United States as "other" film, strips, and sheets wholly or almost wholly of rubber or plastics, which are flexible and unsupported, and not of cellulosic plastics material, at the rate of duty of 12.5 per centum ad valorem. The film is composed of two plastic sheets, one of which is a polyester of United States manufacture and the other a polyethylene of Canadian manufacture. The entry was liquidated on the total entered value of these combined components, and plaintiff contends that an allowance should have been made in the liquidation for the cost or value of the polyester component pursuant to the provisions of item 807.00 of the tariff schedules as amended by Public Law 89–806, 80 Stat. 1523, effective November 10, 1966, retroactively.

It is conceded that a state of facts exists herein procedure-wise which brings the instant case within the application of item 807.00 as so amended. This statute provides for the assessment of duty upon the full value of the imported article less the cost or value of the United States components as to—

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

The evidence at bar shows that the imported film is produced in Canada by an extrusion process in which the Canadian polyethylene is first made from pellets in a liquid form of high viscosity, and then, with the aid of an adhesive or adhesion promoter, is joined with sheets of the United States polyester called mylar, after which finishing operations such as trimming take place when the polyethylene has cooled to solid form like the polyester film to which it has been joined. Roderick Arnold Bolton, a

graduate engineer and the technical manager of W. R. Grace of Canada, Ltd., of Cooksville, Ontario, Canada, the producer and exporter of the involved merchandise, described the process in his testimony as follows (R. 7-8):

Q. Will you please describe the process?—A. Yes. The raw material, which is known as mylar, is received in mill roll forms. These are loaded onto the unwinding stand at the back of the machine.

\* \* \* \* \* \*

A. (Continuing) This mylar is made by DuPont, U.S.A., and is the American made material. The web [1] is processed through a machine, and two operations are done while it is continuously moving. First, an adhesive is applied to the web on one side, and this is dried. Sometimes an adhesion promoter is used instead of a true adhesive. The web is then sent into a nip, where two chilled rolls are held together under some pressure. Directly over this nip there is a slotted die. The slotted die is fed from an extruder, where polyethylene has been heated and mixed, and a back pressure developed on the die so that it extrudes a sheet of polyethylene at a considerable temperature. The polyethylene travels downward into the nip, where it marries up with the mylar web, then passes around a chilled roll, and then kisses a second chilled roll. Then the polyethylene on the edges, which was allowed to exude beyond the edges of the American substrate, are trimmed off. This involves taking, perhaps, a quarter of an inch off the width of the original mylar film, and then the material is very lightly powdered and wound up.

It was also brought out in the testimony of Mr. Bolton that the plastic components when joined together are intended to be used by consumers as a unified article, that separation of the components, while done to test the

strength of the bond, can and does result in damage or destruction of the plastic sheets, that there is no intermixing of the sheets in the involved process, and that the adhesive or adhesion promoter does not produce a change in the mylar's physical identity, form or shape.

The Customs Bureau declined to make allowance in the liquidation of the entry at bar for the American material in accordance with item 807.00 because it found that the Canadian polyethylene is essentially in a molten form when it is applied to the American polyester film, concluding therefrom that the polyethylene is not at the time of assembly a fabricated component designed to be fitted together with another component.

Plaintiff argues that it is immaterial whether or not the Canadian product was a "fabricated" component at the time of assembly, since the United States product was clearly a fabricated component; and that the process here involved did consist of an "assembly" within the meaning of item 807.00. And defendant argues that there has been no "assembly" with respect to the imported merchandise since the Canadian polyethylene was essentially in a molten form when it was applied to the American polyester film.

The word "assemble" is defined by the lexicographers to mean:

2 To fit or join together, as parts of a mechanism.

[Funk & Wagnalls, Standard Dictionary, International Edition (1963)];

2: to bring together: as \* \* \* b: to fit together various parts of so as to make into an operative whole (—a radio set) (air planes being *assembled*)

[Webster's Third New International Dictionary 1961 Edition.]

It would appear from the foregoing definitions either in terms of the text or the exemplars that the term "assemble"

---

1. The witness explained that when a plastic film is threaded through a machine, it is then called a web.

contemplates the joining of mass which is in the form of solids.

In this connection it should be noted that although item 807.00 is the successor statute to paragraph 1615(a) of the 1930 Tariff Act, the word "assembled" which appears in item 807.00 was not used in the predecessor statute. And while we have been cited to no cases by counsel nor have we found any which construe the term "assembled" as used in item 807.00, the Explanatory Notes to the tariff schedules are particularly illuminating with respect to usage of this term in item 807.00, the term being used apparently for the first time in tariff legislation dealing with the subject of reimportation of American made products. In these "notes" at pages 12 through the first paragraph of page 15, the term "assembled" is used several times by the Tariff Commission, the draftsmen of the tariff schedules, in analyzing and discussing prior rulings of the Customs Court, Court of Customs and Patent Appeals, and the Customs Bureau in cases which dealt exclusively with merchandise the parts of which were all in solid form irrespective of origin. The "notes" conclude the discussion pertaining to item 807.00 with a paragraph whose lead sentence states: "In the circumstances, item 807.00 continues the substance of the practice but not under the theory that there has been no advancement or improvement."

One comes away from a study of the Explanatory Notes with the conviction that the framers of item 807.00 have used one form or another of the term "assemble" with the same understanding of its scope as that imparted by contemporary lexicographers, namely, that the term is used to describe the joining or coming together of *solids*. And a certain incongruity develops from an application of the term "assembled" to the description of a process which unites a solid with a liquid.

This is not to say, however, that we believe that the involved process is one in which a solid (polyester) is united with a liquid (polyethylene). On the contrary, the witness Bolton addresses himself to the imported plastic film in the context of a *solid*—employing such words as "adhesive" and "laminate" (which latter word he defines as a combination of two or more substrates) with unmistakable reference to a *solid*. Mr. Bolton testified (R. 17–18):

Q. You referred to the use of an adhesive in describing the process.—A. Yes, I did.

Q. What is the reason for that? Or, the purpose of the adhesive.—A. Right. It's to increase the strength of the bond between the two materials. If you do nothing to the mylar, and just go through the process, you would not have sufficient bond to where the finished laminate would act as a single film in its end use application, so you have to do something to increase that bond.

The word "laminating", with respect to plastics, means bringing two plastic strips into permanent union so that the final product will be in effect an integral article. Liberty Machine Co. v. T. & M. Machine & Tool Corp., D.C.N.Y., 173 F.Supp. 663, 664 (1959). And the word "laminated" means composed of layers of firmly united materials. National Filters, Inc. v. Research Products Corp., C.A. 5, 384 F.2d 516, 519 (1967). It is clear, then, that the words "adhesive" and "laminate" can hardly find proper usage in association with articles which are not *solids* to begin with.

█ It is true, of course, that in the initial stage of the process at bar the polyester is a solid and the polyethylene is a liquid. Nevertheless, the process described in the testimony of the witness Bolton is a controlled operation which anticipates the transformation of the liquid into a solid before completion of the process, and provides in advance for the adhesion of two solids together in the final product. The adhesion phase of the operation to which the polyester is subjected assures permanence of "assembly" of the polyester

with the polyethylene. So that, while there is no "assembly" of the involved materials at the commencement of the operation, there is, in our opinion, an "assembly" of such materials upon completion of the process.

Neither can we agree with defendant's argument that the application of the molten polyethylene to the polyester is like a "coating." Such a description would, at best, describe only the incipient stage of the process at bar. And as the record indicates the polyethylene does not remain in its incipient form. We think defendant's argument is answered in the testimony of Mr. Bolton who testified (R. 22):

Q. What is the advantage of applying the molten polyethylene rather than a dry sheet of Canadian film to the American mylar?—A. Well, there's a process known as chill casting, in which you use equipment similar to that and manufacture a sheet of polyethylene, and what we are doing here, really, is manufacturing a sheet of polyethylene at the same time as we apply it to the mylar, because it has to conform to the surface of the mylar, in order to have no air bubbles or other visible imperfection in the interface.

It seems clear from this uncontradicted testimony that the involved process is nothing more or less than a combination of manufacturing and assembling processes. And we do not find any language in item 807.00 which would rule out a combination of "manufacturing" processes as to the foreign material with the "assembly" processes covered by the statute.

Apart from a consideration of the word "assembled" as it is used in item 807.00, consideration must also be given to the word "articles" with which the word "assembled" is in juxtaposition in that statute. Historically speaking, the word "articles" has had, in its own right, considerable breadth of application in tariff legislation. In interpreting a provision for "articles composed of india rubber" under the Tariff Act of 1897, the Supreme Court, noting and comparing usage of the word "articles" in relation to a provision dealing with the importation of American made goods, among other things, stated that the word "articles" "must be taken comprehensively, and cannot be restricted to articles put in condition for final use, but embraces as well things manufactured only in part, or not at all." Junge v. Hedden, (1892), 146 U.S. 233, 13 S.Ct. 88, 36 L.Ed. 953; accord, United States v. A. A. Vantine & Co., 2 Cir., 166 F. 735, 92 C.C.A. 397 (1908).

Such restriction or limitation as exists on the application of the word "articles" as used in item 807.00 is reflected in the first amendment made to the provision following its enactment. As originally enacted in 1963, 77A Stat. 408, item 807.00 read:

Articles assembled abroad in whole or in part of products of the United States which were exported for such purpose and which have not been advanced in value or improved in condition abroad by any means other than by the act of assembly.

By virtue of the enactment of Public Law 89–241 (Tariff Schedules Technical Amendments Act of 1965, 79 Stat. 933, 949), the text of item 807.00 was amended to read:

Articles assembled abroad in whole or in part of *fabricated components, the product of the United States,* which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting. [Emphasis added.]

In commenting upon this change of language under item 807.00, the House of Representatives Committee on Ways and

Means, in reporting favorably on the bill (H.R. 7969)[2] for passage, stated, among other things:

The U. S. components would be specifically limited to "fabricated" components. * * * Thus, item 807.00 would apply with respect to components of types which are designed to be fitted together with other components and would not apply to chemical products, food ingredients, liquids, gases, powders, etc.

Consequently, it is clear from the above legislative history pertaining to item 807.00 that a limitation on the word "articles" was imposed by Congress only with a view toward restricting the type of *American made* constituents of *assembled articles* which would qualify for the exemption from duty accorded by item 807.00. This restriction is important in enabling the customs officials to be able to follow the res into the foreign country and back into the United States without loss of identity. Nothing was said in the legislative reports relative to the nature and type of the *foreign made* constituents of such *assembled articles,* nor is there the same reason for concern about the foreign made constituents since duty will have to be paid upon them in any event. Hence, in view of the latitude generally accorded to the word "articles" there is no reason to suppose that the foreign made constituents of *assembled articles* are restricted in any manner under item 807.00 save such as is inherent in the concept of the word *assembled.* And we think that polyethylene sheets in solidified form and of foreign origin are as much at home with the term "assembled" as are wood veneers of foreign origin combined with hardwood cores, ground wood hanging paper of foreign origin combined with synthetic textile fabric, beadwork and fabric ornamentation of foreign origin combined with silk fabric, and istle fibers of foreign origin combined with horsehair which the Customs Bureau regards as constituting assembly operations within the purview of item 807.00. See T. D.'s 56462(3), 56199(2), 56038(3), and 56041 (1).

■ Under the evidence adduced in the instant record there is no question but that the domestically produced polyester was at no time subjected to any change in form in the process described by the witness Bolton, and that the polyester remained identifiable after its joinder with the foreign made polyethylene.

Therefore, on the evidence we conclude that the instant case is brought within the ambit of item 807.00, in consequence of which the protest is sustained.

Judgment will be entered accordingly.

2. H.Rept. 342, 89th Cong., 1st Sess. on H.R. 7969, page 49.