**CARTER FOOTWEAR, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 85–6–00796.**

United States Court of
International Trade.

Aug. 5, 1987.

Siegel, Mandell & Davidson, P.C. (Brian S. Goldstein and David Newman), New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice (Susan Handler-Menahem), New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

TSOUCALAS, Judge:

This action is before the Court after trial, to determine whether imported footwear components are entitled to be entered duty free under item 807.00, TSUS, as American goods returned. Previously, the Court had occasion to consider this matter in *Carter Footwear v. United States*, 10 CIT —, Slip Op. 86–95 (September 19, 1986) [available on WESTLAW, DCT database], where the parties' cross-motions for summary judgment were denied.

### BACKGROUND

The imported merchandise, consisting of footwear uppers, was classified by Customs under item 386.50, TSUS, and liquidated at the *ad valorem* rate. Certain components of the completed upper were exempt from duty under item 807.00. No duty allowance was extended to the cotton textile vamp, which comprises the front portion of the footwear upper, as it was

allegedly further fabricated by virtue of a plastic toe reinforcement. Pursuant to item 807.00, TSUS, articles assembled abroad are entitled to a duty free allowance for those fabricated components of U.S. origin which

(a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

The record indicates that the textile vamp, cut to exact shape and size in the United States, is exported to plaintiff's plant in the Dominican Republic along with thread, bindings, eyelet, tape, ink, and the thermoplastic (in rod form on reels). According to the testimony of Mr. Melvin Potash, plaintiff's Vice President of Manufacturing, and that of Luis Mercado, General Manager of the Dominican plant, the first operation in the Dominican Republic is to apply a box toe reinforcement. The box toe (a term commonly used and understood in the footwear industry) functions to add shape and reinforce the toe area of the cotton shoe. The style and end usage of a particular shoe determines whether a box toe is applied. As Mr. Potash described this process, the exported plastic rod (a polyamide thermoplastic) is fed into a box toe applying machine (BTAM), which, at 350°F, heats the plastic until it reaches a molten state. The operator places the vamp in the machine's clamping device and depresses a pedal which causes a rotating cylinder to deposit a crescent shaped layer of this plastic on the toe area of the vamp. This area is now known as a box toe reinforcement. The shape and thickness of the plastic is controlled by the machine's matrix, which was predetermined before introducing the plastic. The matrix produced a thicker layer of plastic at the upper top for greater shape retention and enforcement and a tapered effect at the opposite end to prevent irritation to the toe and to eliminate visibility from outside the vamp.

Both Mr. Mercado and Mr. Potash testified that once the plastic is applied, it solidifies in a matter of seconds, allowing the operator to immediately continue the process with another vamp. The entire box toe application takes about one second. After completion of this procedure, the edges of the vamp are thermocemented, bindings and eyelets are attached, the vamp is joined to the textile quarter and tongue, and elastic is stitched. Mr. Potash stated the thermoplastic was applied at the most opportune time: if performed incorrectly at a later stage, the entire upper would be jeopardized; if applied prior to exportation the increase in handling would also risk damage. The merchandise is assembled in plaintiff's Dominican plant due to time demands and plaintiff has found it more economical to conduct all these operations in one plant.

## DISCUSSION

Plaintiff's initial hurdle is to prove that the thermoplastic is a solid, since for purposes of item 807.00, assembly involves the joinder of solids. *United States v. Baylis Bros. Co.*, 59 CCPA 9, 11, C.A.D. 1026, 451 F.2d 643, 645 (1971); *E. Dillingham Inc. v. United States*, 60 CCPA 39, 43, C.A.D. 1078, 470 F.2d 629, 633 (1972). Acceptable assembly operations are delineated in 19 C.F.R. § 10.16(a) as: welding, soldering, riveting, force fitting, gluing, laminating, sewing, or the use of fasteners. "The mixing or combining of liquids, gases, chemicals, food ingredients, and amorphous solids with each other or with solid components is not regarded as an assembly." *Id.*

Two cases have addressed claims for 807.00 treatment where one of the components was initially a molten substance. In *C.J. Tower & Sons of Buffalo, Inc. v. United States*, 62 Cust.Ct. 643, C.D. 3840, 304 F.Supp. 1187 (1969), an American made mylar was joined to a foreign made polyethylene of high viscosity to form the imported film. The latter was manufactured through an extrusion process in liquid form and concurrently "married up" with the mylar; upon cooling, the polyethylene was a solid. Although there was no assembly

initially, the court held that upon completion of the process this was an acceptable assembly since:

> [this] is a controlled operation which anticipates the transformation of the liquid into a solid before completion of the process, and provides in advance for the adhesion of two solids together in the final product.

62 Cust.Ct. at 647–48, 304 F.Supp. at 1190. Combining the processes of manufacturing the foreign component with assembly to the mylar is not prohibited by item 807.00, which only restricts the condition of the American component. 62 Cust.Ct. at 648, 304 F.Supp. at 1191.

Furthermore, neither item 807.00 nor the regulation dictates that the foreign component be a solid at the time of its initial contact. *Sigma Instruments, Inc. v. United States,* 724 F.2d 930, 932 (Fed.Cir.1983). The court found an assembly where the process involved positioning fourteen terminals in a mold that was subject to a compound of viscous material. Upon hardening, the molten material formed a plastic base fixing the terminals in a definite configuration to create relay headers.

Defendant has maintained that contrary to *Tower* and *Sigma,* the plastic herein is merely a liquid coating which has dried rather than a solid. In bearing its burden on this issue, plaintiff called Dr. David W. Riley, deemed a chemical expert in the field of plastics, who has experience with the effect of thermoplastics on textiles. Dr. Riley stated that the polyamide thermoplastic in molten form is a solid since it exhibits those distinct characteristics such as elasticity,[1] high viscosity[2] and tensile strength. He explained that at 300°–400°F polyamides become molten which mean that they can be reshaped. Dr. Riley's definition of solids encompass materials which can be reasonably constant in form and shape whereas liquid is the state of a fluid which seeks its own level,[3] it has no elasticity and is thin (low viscosity). Although the molten plastic takes on the shape of the melting pot, and it can flow, Dr. Riley opined that this was not determinative of whether the plastic was a solid.[4] He stated that flow is the movement of material from one place to another;[5] solids do flow depending upon the pressure to which they are subjected. Even in the molten state the thermoplastic retains crystallinity[6] which is specific to solids. Differences in molecular weight determine whether a substance liquifies when melted, such as an ice cube. Liquids lie flat when melted (i.e., melted steel, since it has no elasticity and honey eventually would do the same). However the polyamide would have peaks and valleys when melted and not lie flat.

Dr. Riley's magnified inspections of two sample vamps revealed that the plastic was sitting on the yarn with no penetration through the fibers. In his opinion, the high viscosity and elasticity of the thermoplastic prevented it from penetrating or intermixing with the individual fibers of the yarn. Dr. Riley noticed that the plastic was of a different thickness on parts of the vamp which he concluded was consistent with a solid since a liquid would seek one level. He further explained that the weight of the plastic causes it to sag into the fabric and the plastic physically adheres or conforms

---

1. The ability of a material to recover its original shape after a deforming force has been removed. *See* Van Nostrand Reinhold, *The Condensed Chemical Dictionary* 403 (Tenth Ed. 1981).

2. The internal resistance to flow exhibited by a fluid; the ratio of shearing stress to rate of shear. *Id.* at 1089.

3. A liquid is an extremely fluid substance that flows freely, with definite volume but no definite form except that given by its container. *See Webster's Third New International Dictionary* (1981)

4. A solid is a substance that does not flow perceptibly under moderate stress; has a definite capacity for resisting forces which tend to deform it; and under ordinary conditions retains a definite size and shape. *Id.*

5. As a verb this means to move with a continuous change of place among the particles; used as a noun it is the motion characteristic of gases, liquids and viscous solids in which there is a change of form under the action of forces. *Id.*

6. *See The Condensed Chemical Dictionary* at 957.

to a portion of the surface yarn. This affinity between the plastic and textile will cause some properties of the textile and the plastic to attach to each other and the cotton fabric will be stiffened as a result. If enough interstitial holes exist between the warp and the weft,[7] the molten plastic will seep between them. Comparatively, a liquid would penetrate the interstices between the fibers of the yarn, thoroughly wetting the entire fabric and creating a wicking effect. Dr. Riley responded that removal of the box toe application would result in some damage to the textile although he was able to separate the plastic from the textile. The textile is comprised of two layers of fabric, the plastic adhering to the first while the second remained intact.

Defendant's witness, Mr. George Walter, supervising chemist at the Customs' laboratory, also conducted independent tests of the vamp with the box toe. Cross-sectional views from a stereomicroscope disclosed that the plastic flowed beneath the top surface, impregnated the yarn and the fibers, and he detected holes or air bubbles. This lead Mr. Walter to conclude that the plastic was a liquid. Under his supervision, the vamp was treated with Dupont stain which would identify the thermoplastic as red and the cotton fibers as green. Photographs of these views revealed that the plastic entered the interstices of the cotton embedding the fibers, but Mr. Walter found no polyamide within the fibers of the yarn.

It is noteworthy that in *Sigma* and *Tower*, the foreign material was originally freely flowing assuming the shape or space allowed by the operation. These cases clearly delineate that the foreign component, the thermoplastic, can be in a transitory molten state upon initial contact with the vamp subject to a controlled operation which anticipates the rapid solidification or hardening of the plastic before completion of the process. Every witness including Mr. Walter, testified that the thermoplastic at room temperature would, and did, solidi-

fy almost immediately after contact with the vamp. Dr. Riley provided a substantiated basis for his conclusion that the plastic was a solid; he was able to enumerate and identify the salient features of the polyamide; and satisfactorily explained how the plastic conformed to the contours of the fabric. The witnesses' examinations of the material did not conflict: neither found that the plastic had seeped into the fibers themselves. Thus, the fabric remains identifiable as did the component in *Tower*. Therefore, this process is not a coating since that "would, at best, describe only the incipient stage of the process at bar. And as the record indicates [the plastic] does not remain in its incipient form." 62 Cust.Ct. at 648, 304 F.Supp. at 1191. The Court is persuaded that upon completion of this process there is a permanent union of two solids.

■ Having resolved that the box toe is a solid the question remains as to whether its application to the vamp constituted further fabrication. Plaintiff must show that the vamp was a fully fabricated component when exported in condition ready to be assembled. This criteria requires the vamp to be in a finished condition, namely: all essential stages in the production of the material must be performed prior to exportation. *Zwicker Knitting Mills v. United States*, 67 CCPA 37, 41, C.A.D. 1240, 613 F.2d 295, 298 (1980) (glove shells were exported before the locking stitches on the fingertips were sewn closed to prevent unraveling). The operation must not be of such an essential nature that in its absence the component would not be capable of being assembled. *Rubberset Co. v. United States*, 73 Cust.Ct. 107, 111, C.D. 4560 (1970). The joinder of materials cannot complete the manufacturing process of the exported component. *United States v. Mast Industries, Inc.*, 69 CCPA 47, 52, 668 F.2d 501, 504 (1981). "Without further fabrication" requires that the article be imported without substantial change or improvement, *Rudolph Miles v. United*

7. The fabric is woven from a series of yarns; those extended lengthwise are the warp; those yarns that cross or fill the warp are the weft or woof. Each yarn is comprised of a bundle of fibers.

*States*, 65 CCPA 32, 36, C.A.D. 1202, 567 F.2d 979, 982 (1978) (burning holes and slots in Z-beams); or without much further labor expended to put the material in a condition ready to be assembled. *E. Dillingham*, 60 CCPA at 44, 470 F.2d at 633 (1972).

■ The application of the box toe did not further fabricate the vamp; it did not create the basic article. *See Procter & Gamble Distributing Co. v. United States*, 11 CIT ——, Slip Op. 87–72 at 4 (June 24, 1987) [Available on WESTLAW, DCT database]; *compare Zwicker, supra.* If the molten plastic was first created in crescent shapes and then attached, conceptually this would be easier to accept as an assembly. Yet, as announced in *Sigma*, achieving a more direct method of assembly does not prevent 807.00 qualification. Moreover, the evidence of record does not demonstrate that this operation entailed significant time or labor. The machine's matrix was predetermined, the operator exercised no judgment or discretion in applying the box toe. The operation lasted approximately one second and the box toe solidified in a matter of seconds, whereas production of the complete upper took about one minute. This is vastly different than any preparatory processing of a raw material which must be performed on the vamp to enable it to be assembled. *See E. Dillingham*, 60 CCPA 39, 470 F.2d 629 (fibers were required to be opened, oiled and carded before they could be needled into the fabric).

Furthermore, item 807.00 logically assumes that there has been an advancement in value or improvement in condition of the article, and provided it is solely by virtue of the act of assembly, it may be accorded the statute's preference. *Miles*, 65 CCPA at 37, 567 F.2d at 983. Defendant contends that this plastic coated the textile merely changing its quality in that it now possesses the features of stiffness and reinforcement. Nonetheless, each act of assembly seems to add some new quality to the component: in *Baylis*, the smocking of dress fronts by sewing thread through a stenciled design on the fabric; in *E. Dillingham*, the needling fibers into a fabric; and

in *Mast*, the buttonholing and pocket slitting of pants. While defendant differentiates situations such as *Sigma* and *Tower* because they involved the creation of a new article by reason of the assembly (the headers and film, respectively), this tends to misstate the logic applied therein. The proper emphasis is that merely because the components were incorporated into a new and different article does not exclude them from the parameters of item 807.00. *Sigma*, 724 F.2d at 932.

Finally, the vamp has not lost its physical identity. The concern in this area focuses on the ability of Customs to follow the American component from exportation to reimportation in the assembled article. To achieve this end the American component cannot be a chemical product, food ingredient, liquid, gas, etc., *see* H.R.Rep. No. 342, 89th Cong., 1st Sess. 49 (1965); *Tower*, 62 Cust.Ct. at 649, 304 F.Supp. at 1192; which could become "lost" in the final product. The purpose of the present item 807.00 was to eliminate the "constructive segregation" doctrine which required that a component would be eligible for 807.00 status if it could be identified or removed without injury to itself or the article. *Baylis*, 59 CCPA at 11–12, 451 F.2d at 646. As apparent in *Tower*, separation of the mylar and polyethylene would result in damage to both, yet that did not preclude the court from finding an acceptable assembly.

It has been held that a change in the fabric cannot be equated with a loss of its physical identity. *E. Dillingham*, 60 CCPA at 46, 470 F.2d at 635. In that instance the assembled article, the fibers entwined in the fabric to form papermakers' felts, acquired a new physical identity with a new commercial utility. Yet this did not cause the fabric to lose its physical identity. *Id.*

Defendant maintains that this operation is not at all related to the assembly because prior to this test shipment, the box toe was applied in the United States. Nevertheless, the Court does not consider it wise to dictate the sequence in which goods may be assembled so long as the criteria in 807.00 are otherwise satisfied.

The Court finds that these requirements have been met and the ability to follow the vamp through the assembly has not been impaired. Having found that this is an acceptable assembly, it is not necessary to decide plaintiff's alternative claim as to whether this is an operation incidental to the assembly process.

## CONCLUSION

Plaintiff has met its burden by proving that the thermoplastic box toe is a solid for purposes of item 807.00, TSUS. Although in a molten condition when first joined with the vamp it rapidly solidifies and retains the properties of a solid when joined with the vamp. The foreign operations in no way finished the vamp or caused a loss of its physical identity. The change in its quality or appearance is limited solely to the act of assembly. Therefore, the Court finds that the vamp qualifies for item 807.-00 treatment. So ordered.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED: that the merchandise imported under cover of the entries that are the subject of this action qualify for duty free allowance under item 807.00, TSUS; and it is further

ORDERED, ADJUDGED and DECREED: that the United States Customs Service shall reliquidate the entries in accordance with item 807.00, TSUS, and shall refund any excess duties paid together with interest, as provided by law.