# Slip Op. 04-112

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| ABB, INC. | : | |
| Plaintiff, | : | |
| | : | Court No. 03–00183 |
| v. | : | |
| UNITED STATES, | : | |
| Defendant. | : | |

[Defendant's cross–motion for summary judgment granted.]

Dated:  September 2, 2004

Simons & Wiskin, (Philip Yale Simons and Jerry P. Wiskin) for plaintiff.

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Graves Walser), Michael W. Heydrich, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for defendant.

## OPINION

**RESTANI, Chief Judge:**

### INTRODUCTION

Plaintiff ABB, Inc. imported three underwater cables into the United States in connection with the Cross Sound Project, which links the New England power grid with the Long Island

power grid along the bottom of the Long Island Sound.  The United States Customs Service[1]

classified two of the cables, both high voltage electrical cables, under subheading 8544.60.40 of

the Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C. § 1201 (2000), and

classified the other, a fiber optic cable, under subheading 8544.70.00.  ABB challenges these

classifications on the grounds that, because the three cables were bound together with steel straps

after importation, the cables were imported as unassembled parts of a single fiber optic cable

"assembled with electrical conductors."  Such a cable would be classified under 8544.70.00, duty

free.

ABB's administrative protest was denied pursuant to 19 U.S.C. § 1515(a).  The court has

jurisdiction over this civil action pursuant to 28 U.S.C. § 1581(a).  Both ABB and the

Government move for summary judgment.  Summary judgment is appropriate when there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law.  CIT R. 56.  The court finds that no genuine issues of material fact remain.  Because the

three fully–manufactured, functioning cables were fastened together after importation through a

project–specific bundling process, they cannot be classified as the unassembled parts of a single

fiber optic cable or composite machine.  Accordingly, the Government's motion for summary

judgment is granted and ABB's motion is denied.

---

[1]  Effective March 1, 2003, the U.S. Customs Service was renamed the Bureau of
Customs and Border Protection of the United States Department of Homeland Security.  See
Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. 108–32,
at 4 (2003).  For ease of discussion, this opinion refers to both incarnations as "Customs."

## BACKGROUND

**I.     THE HARMONIZED TARIFF SCHEDULE PROVISIONS IN ISSUE**

The relevant HTSUS provisions are Heading 8544 and certain of its subheadings:

| 8544 | Insulated (including enameled or anodized) wire, cable (including coaxial cable) and other insulated electric conductors, whether or not fitted with connectors; optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors or fitted with connectors: |

. . .

| 8544.60 | Other electric conductors, for a voltage exceeding 1,000 V: |

. . .

| 8544.60.40 | Other:<br>Of copper |

. . .

| 8544.70.00 | Optical fiber cables |

Heading 8544, HTSUS.

**II.     THE MERCHANDISE IN ISSUE**

The three articles in issue consist of two high voltage direct current ("HVDC") submarine cables and one fiber optic submarine cable. ABB entered the cables as three separate articles, with each HVDC cable entering under subheading 8544.60.40 at a duty rate of 3.5% of the cable's value and the fiber optic cable entering under subheading 8544.70.00, duty free. Customs classified the articles as entered. After final liquidation, ABB protested the classification, alleging that the three cables were unassembled parts of a single article properly classified under

8544.70.00.  Customs denied this protest on April 14, 2003.

### A.      The HVDC Cables

The HVDC cables are manufactured by ABB High Voltage Cables AB, in Karlskrona, Sweden.  Def.'s Stmt. of Facts at ¶2; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶11.  Each HVDC cable consists of a copper conductor surrounded, in succeeding order, by plastic insulation, water sealing tape, a metallic shield, an inner jacket, tensile armoring, and an outer jacket.  Def.'s Stmt. of Facts at ¶9; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶9; Aff. of Jan Lindhe, ABB Project Installation Manager for the Cross Sound Project, at ¶8 [hereinafter Lindhe Aff.].  The HVDC cables have no other use except to transmit direct current electricity.  Lindhe Aff. at ¶10.  The HVDC cables were entered and classified under HTSUS subheading 8544.60.40 at duty rate of 3.5% of their value.  Pl.'s Stmt. of Facts at ¶6; Def.'s Stmt. of Facts at ¶26.

### B.      The Fiber Optic Cable

The fiber optic cable was manufactured by Ericsson Network Technologies AB, Hudiksvall, Sweden.  Lindhe Aff. at ¶9.  At the center of the cable are optical fibers individually sheathed with acrylate and arranged around a slotted polyethylene core.  Id.; Ericsson Fiber Optic Cable Product and Order Information, Def.'s Resp. Br., Ex. C [hereinafter Ericsson Fiber Optic Cable Information].  The arrangement of optical fibers is protected by an inner polyethylene jacket, a water–proof copper tube, a double layer of steel wire armor, and an outer polyethylene jacket.  Def.'s Stmt. of Facts at ¶16; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶16; Ericsson Fiber Optic Cable Information, Def.'s Resp. Br., Ex. C.  The fiber optic cable was classified under

subheading 8544.70.00, HTSUS, duty free.  Pl.'s Stmt. of Facts at ¶5; Def.'s Stmt. of Facts at ¶27.

### C.      The Cross Sound Project

The submarine cables were imported for the Cross Sound Project, which links the New England power grid with the Long Island power grid to provide electricity to Long Island and improve the reliability of the power supply in Connecticut and New England.  Def.'s Stmt. of Facts at ¶4.  The cables connect HVDC substations in New Haven, Connecticut and Brookhaven, New York.

### 1.      The State of the Cables Upon Entry

Each cable was fully–manufactured and functional upon leaving its manufacturing plant. Pl.'s Resp. to Def.'s Stmt. of Facts at ¶¶ 12, 13, & 15 (HVDC cables); id., at ¶¶ 18, 19, 20, 21 (fiber optic cable).  After manufacture, the three cables were loaded in Sweden onto a special cable laying vessel, the Sea Spider.  Def.'s Stmt. of Facts at ¶23; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶23.  The two HVDC cables were loaded simultaneously in individual compartments in a rotating turntable on the deck of the ship.  Lindhe Aff. at ¶7.  The fiber optic cable was then loaded onto the ship into a circular container known as a "static coil."  Id.; VDS Cable bv Project Quality Manual, Sec. 6.4.3.6, Pl.'s Op. Br., Ex. 1.  The cables did not undergo further processing prior to the arrival of Sea Spider in the Long Island Sound.  Lindhe Aff. at ¶14.  The Sea Spider crossed the Atlantic Ocean and made its first port of call in New Haven, where the United States Coast Guard inspected the vessel and Customs cleared the cargo.  After the ship received clearance from Customs, the Cross Sound Project's installation team arrived on the vessel and

made preparations to lay the cables.

### 3.     The Bundling and Laying of the Cables

As the cables were laid in the Long Island Sound, they were bundled together with metal straps.    Def.'s Stmt. of Facts at ¶33; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶33.  Laying the cables in a bundle was more efficient and convenient than laying each separately, and the bundle also provided a more accurate means of laying the cables along a predetermined route.  Lindhe Aff. at ¶17.  The size of the three cables would have made it difficult to combine their contents within a single cable at the time of manufacture.  Id.  The use of separate electrical cables also allows them to cool more efficiently.   Id.

The bundling operation was a continuous operation consisting of three stages.  Id.  First, the two HVDC cables were removed from the turntables on which they were stored during transit.  Id.  Next, the fiber optic cable was taken from its static coil position.  Id.  The three cables were then secured together with metal straps at the bundling station on the deck of the ship.  Id.  Each strap was approximately 10 millimeters wide.  The straps were manually placed and tightened around the three cables at intervals ranging from two to five meters.  Id.;  Def.'s Stmt. of Facts at ¶33; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶33; see also VDS Cable bv Project Quality Manual, Sec. 6.6.1 ("The strapping interval will be 2 to 5 [meters] and can be changed according to the visual confirmation of the straps during touch down monitoring done by the [remote operating vehicle]").  This spacing interval between the steel bands was specific to the Cross Sound Project, and depended on various factors such as the speed of the cable laying vessel, the use of chafing gear to protect the cables, the depth of the water, and whether the

cables were "floated" as they approached the shoreline. Def.'s Stmt. of Facts at ¶34; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶34. The strapping interval was monitored visually and subject to alteration. The bound portions of the cables descended through the water into a trench dug along a predetermined route by a remote operating vehicle.

## DISCUSSION

The issue before the court is whether a finished fiber optic cable and two finished high-voltage, direct current copper cables are properly classified as a single article if, after importation, they are bound together with steel bands before they are laid on the sea floor. Customs refused to classify the cables in such a manner, treating them as three separate articles. ABB challenges the classification on the ground that HTSUS subheading 8544.70.00, which Customs applied to the fiber optic cable only, instead should have covered all three cables as unassembled pieces of a single fiber optic cable "assembled with electric conductors." In the alternative, ABB contends that the cable bundle is a composite machine classifiable under 8544.70.00 as well. Because the bundling of the finished cables constitutes neither an assembly operation nor the creation of a composite machine, Customs classified the merchandise properly.

## I.      THE SUBMARINE CABLES ARE NOT UNASSEMBLED PARTS OF A SINGLE ARTICLE

A court analyzes Customs' classification of merchandise in two steps: (1) ascertaining the proper meaning of the relevant tariff provisions, and (2) determining whether the subject imports fall within the relevant headings. Universal Elec. Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997).

In the first step, the court must determine de novo "the correct meaning of a tariff provision so that all future importers will know what the tariff provision means." Id. at 492 n.3; see also id. at 492 ("the importer has no duty to produce evidence as to what the law means because evidence is irrelevant to that legal inquiry").

    **A.     HTSUS 8544.70.00, "optical fiber cables . . . whether or not assembled with electric conductors"**

The relevant HTSUS heading in this case is 8544, which covers, among other things, "optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors." HTSUS 8544. The relevant subheading within 8544 is 8544.70.00, which lists "optical fiber cables."[2] The Explanatory Notes elaborate on what is covered by Heading 8544: "[t]elecommunications wires and cables (including submarine cables and data transmission wires and cables)," which "are generally made up of a pair, a quad or a cable core, the whole usually covered with a sheath." Harmonized Commodity Description and Coding System Explanatory Notes, 85.44 (2d ed. 2002) [hereinafter Explanatory Notes].[3]

Related to 8544 and 8544.70.00 is heading 9001, which covers, in relevant part, "[o]ptical fibers and optical fiber bundles; optical fiber cables other than those of heading 8544." HTSUS 9001. Thus, optical fiber cables made up of individually sheathed fibers are classified under heading 8544 and subheading 8544.70.00, while optical fiber cables not made up of

_____

   [2] There is no dispute as to the meaning of HTSUS 8544.60.40, which applies to the electrical cables if they are treated as separate articles.

   [3] Although the Explanatory Notes are not binding on the court, they are recognized as instructive in clarifying legislative intent regarding the scope of HTSUS provisions. EM Industries, Inc. v. United States, 22 CIT 156, 162, 999 F. Supp. 1473, 1478 (1998).

individually sheathed fibers, as well as optical fibers and optical fiber bundles, are classified under heading 9001 and certain of its subheadings.

According to ABB, HTSUS subheading 8544.70.00 covers the submarine cables as a single article assembled after importation. Although it is a general principle of customs law that "imported merchandise is dutiable in its condition as imported," Simod America Corp. v. United States, 872 F.2d 1572, 1577 (Fed Cir. 1989), GRI 2(a) commands that headings be interpreted to include an article that enters unassembled or disassembled. GRI 2(a), HTSUS. GRI 6 states that "classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related notes and, [with the necessary changes], to the above rules." GRI 6. Thus, ABB's claim—that the three cables it imported are the unassembled parts of a single fiber optic cable "assembled with electrical conductors"—is plausibly consistent with the rules for interpreting the HTSUS.

### 1.     "Optical fiber cables"

The plain meaning of "optical fiber cables, made up of individually sheathed fibers, whether or not assembled with electric conductors" is that the heading includes both optical fiber cables made up of individually sheathed fibers that were assembled with electric conductors and optical fiber cables made up of individually sheathed fibers that were not assembled with electric conductors. Customs illustrated the meaning of the provision by applying it to five types of cables that were "composite cables" because they contained both optical fibers and electrical conductors within single-sheath cable assemblies. Cust. HQ Rul. 084958, 1989 U.S. Cust. HQ Lexis 2505, at *3–*4. Although that 1989 Customs headquarters ruling made clear that optical

fibers and electrical conductors manufactured to share a common sheath constituted a fiber optic

cable "assembled with electrical conductors," it must be determined whether the meaning of

"assembled" encompasses a broader set of facts.[4]

### 2.        "Whether or not assembled with electric conductors"

The term "assembled" is not defined by the HTSUS.[5]  A term not defined by the HTSUS

receives its "common and popular meaning," which is presumed to be the same as its commercial

meaning.  Rollerblade, Inc. v. United States, 282 F.3d 1349, 1352 (Fed. Cir. 2002).  In

ascertaining a term's common meaning, a court may consult "dictionaries, scientific authorities,

---

[4]  ABB contends that, because of the persuasiveness of HQ Ruling 084958, its cables
warrant similar treatment as "composite cables."  See Pl.'s Op. Br. at 22–23 (discussing United
States v. Mead Corp., 533 U.S. 218 (2001), which held that, depending on several factors, certain
Customs rulings warrant some deference pursuant to Skidmore v. Swift & Co., 323 U.S. 134
(1944)).
       In Headquarters Ruling 084958, there was no question that the optical fibers and
electrical conductors were assembled together into individual cables.  Each of the subject cables
was manufactured by Siemans Corporation to contain optical fibers and electrical conductors
within a single outer sheath, which in most cases was a lead–cured neoprene jacket.  See Siemans
Coproration Submissions to Customs (June 7, 1989), Wiskin Aff., Ex. B.  While it may not be
necessary in all cases that the optical fiber and electrical parts of a fiber optic cable be assembled
within a common sheath on a factory assembly line in order to be "assembled with electrical
conductors," that is certainly a distinguishing feature from the product at hand.  To directly apply
HQ Ruling 084958 here would be to ignore the principal issue in this case:  whether three
individual, fully–manufactured, functional cables should be considered as the unassembled parts
of a single article if, after importation, they are bound together with metal straps as they are laid.
Cf. Rainin Instrument Co. v. United States, 288 F. Supp. 2d 1360 (Ct. Int'l Trade 2003) (citing a
Customs ruling letter issued to an entity other than the importer where the merchandise was
identical).

[5]  The Explanatory Notes to GRI 2(a) discuss how unassembled or disassembled articles
might be assembled, but do not directly define "assembled":  "'articles presented unassembled or
disassembled' means articles the components of which are to be assembled either by means of
fixing devices (screws, nuts, bolts, etc.) or by riveting or welding, for example, provided only
assembly operations are involved."  Explanatory Notes GRI 2(a)(VII).

and other reliable information sources." Id.  (quoting C.J. Tower & Sons of Buffalo, Inc. v.

United States, 673 F.2d 1268, 1271 (C.C.P.A. 1982)).

Dictionaries provide a common understanding of the verb "assemble," and, by extension,

"assembled":  "2 : to fit together the parts of," Merriam–Webster Online Dictionary at

http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=assemble; "2. To fit together the

parts or pieces of:  assemble a machine; assemble data," The American Heritage Dictionary 110

(3d. ed. 1996); "2. b.  To put together (the separately manufactured parts of a composite machine

or mechanical appliance); also with the machine as obj." The Oxford English Dictionary vol.I,

705 (2d ed. 1989); "2 [. . .] b: to fit together various parts of so as to make into an operative

whole [e.g., a radio set] [e.g, airplanes being assembled];" Webster's Third New International

Dictionary 131 (1981).  Thus, in lexicographical terms, to assemble something is "to fit together

the parts or pieces of" that thing.

This definition accords with a line of customs cases beginning with C.J. Tower & Sons of

Buffalo, Inc. v. United States, 62 Cust. Ct. 643, 304 F. Supp. 1187 (Cust. Ct. 1969), which

defined "assemble" as "the joining or coming together of solids" within the meaning of item

807.00 of the now–repealed Tariff Schedule of the United States ("TSUS").  Id. at 646–47, 304

F. Supp. 1189–90; see also Sigma Instruments, Inc. v. United States, 724 F.2d 930, 931 (Fed.

Cir. 1983) (citing C.J. Tower and defining an "assembly" as "the joining or coming together of

solids" for the purposes of TSUS 807.00); E. Dillingham, Inc. v. United States, 470 F.2d 629,

633 (C.C.P.A. 1972) (same); United States v. Baylis Bros. Co., 451 F.2d 643, 645 (C.C.P.A.

1971) (same).

C.J. Tower provided the original, authoritative construction of "assembled" in the context of TSUS item 807.00, a provision "dealing with the subject of reimportation of American made products." 62 Cust. Ct. at 646–47, 304 F. Supp. at 1189–90. In arriving at a common meaning for "assembled," C.J. Tower relied in part on dictionary definitions nearly identical to those quoted above. Id. at 646, 304 F. Supp. at 1189 (quoting two dictionaries to show that assemble is defined by lexicographers as "[t]o fit or join together"). That C.J. Tower replaced "to fit together" with "joining or coming together" and "parts" with "solids" is attributable to the influence of the relevant tariff provision's Explanatory Notes and to the fact that a liquid/solid dichotomy was at issue. See id. at 646–47. Regardless, C.J. Tower concluded that the "framers" of item 807.00 used "assemble" with "the same understanding of its scope as that imparted by contemporary lexicographers." Id. Those same lexicographical understandings are reflected in the dictionary definitions quoted above. See supra at 11. Considering the meaning consistently assigned to "assembled" by courts and lexicographers, and with no relevant legislative history to

the contrary,[6] the court concludes that the meaning of "assembled" in Heading 8544 is "to have

fit together the parts or pieces of." This definition consists of two key terms: "fit together" and

"parts."

The term "fit together" indicates that the manner in which the parts are conjoined is

readily apparent and, consequently, little or no discretion is required of the assembler during the

fitting operation. Cf. Baylis Bros. Co. v. United States, 64 Cust. Ct. 256, 260 (1970) (finding an

assembly operation where garment workers did not exercise "any independent judgment" in

following a "pre–determined stenciled design"), aff'd, Baylis Bros., 451 F.2d at 11 (noting the

Customs Court's "independent judgment" rationale  and concluding that the operation was "well

within the common meaning of 'assembly,' since the operation merely consists in joining the two

components together according to the stenciled designs"). In other words, the parts have a

_____

[6] Optical fiber cables receive duty free treatment in Subheading 8544.70 as a result of Presidential Proclamation 7011, which implemented the World Trade Organization Ministerial Declaration on Trade in Information Technology Products and the Agreement on Distilled Spirits ("ITA"). Proclamation No. 7011, 62 Fed. Reg. 35,909 (June 30, 1997). This proclamation does not provide insight into what constitutes an assembly, but it at least demonstrates that the favorable tariff treatment sought by ABB for its electrical cables was targeted specifically at telecommunications equipment.

In the ITA, WTO members agreed to eliminate duties on information technology products, including telecommunications equipment. Id. In accordance with the agreements made by the parties to the ITA, Presidential Proclamation 7011 provided for the staged reduction of the duty rates on optical fiber cables culminating in duty free treatment effective January 1, 2000. Id. at 35,939. While the implementation of the ITA into the HTSUS does not provide great insight into the meaning of "assembled," it indicates that fiber optic cables in Subheading 8544.70.00 are given duty free treatment because the United States—acting with congressional authorization—sought to expand trade in these and other information technology products. Likewise, Presidential Proclamation 7011 provided for tariff reductions on three subheadings of electric conductors, for a voltage not exceeding 1,000 volts, of a kind used for telecommunications. Neither the ITA nor Presidential Proclamation 7011 provided such treatment for the high-voltage electrical cables at issue here. Accordingly, they are not indicative of legislative intent to provide duty free treatment for HVDC cables.

predetermined manner of fitting together, and all that is left is to fit them together.  To have a predetermined manner of fitting together, the assembly process must be more standardized than unique.  Webster's examples of usage confirm this by referring to products—a radio set and airplanes—which are generally produced in significant quantities according to predetermined instructions.  See Webster's Third New International Dictionary 131.

The second term, "parts," requires, at a basic level, that there exists a whole to which the parts pertain.  See, e.g., The American Heritage Dictionary 1319 (defining "part" as "1. A portion, division, piece, or segment of a whole."); Webster's Third New International Dictionary 131 (defining "assemble" as that which occurs when parts are fit together to make "an operative whole").  The Federal Circuit and its predecessor are more specific:  a "part" is either (1) "an integral, constituent, or component part, without which the article to which it is to be joined, could not function as such article," or (2) "dedicated solely for use with an article."  Bauerhin Tech. Ltd. P'ship v. United States, 110 F.3d 774, 778–89 (Fed. Cir. 1997) (quoting United States v. Willoughby Camera Stores, Inc, 21 C.C.P.A. 322, 324 (1933), and reconciling it with United States v. Pompeo, 43 C.C.P.A. 9 (1955)).  But see Ludwig Svensson Inc. v. United States, 23 CIT 573, 62 F. Supp. 2d 1171 (1999) (characterizing Bauerhin as requiring an item to meet both definitions of "part").  A putative part fails to meet either definition if, whether separately or joined to the putative whole,  it is "a distinct and separate commercial entity."  Willoughby Camera, 21 C.C.P.A. at 325; Bauerhin, 110 F.3d at 779 (applying the Willoughby Camera "distinct and separate commercial entity" criteria to the second definition of parts, which derives from Pompeo, 43 C.C.P.A. at 13).

### B.        The Application of HTSUS 8544.70.00 to the Cable Bundle

In the second step of the classification analysis—the application of the tariff provision to the merchandise in issue—a court presumes that Customs applied the provision correctly, which means that the plaintiff is left with the burden of showing by a preponderance of the evidence that Customs' decision was incorrect.  See Rollerblade, 282 F.3d at 1352 (citing 28 U.S.C. § 2639(a)(1)); Libas, Ltd. v. United States, 193 F.3d 1361, 1365 (Fed. Cir. 1999).  In weighing the evidence adduced by the importer and the government, the court must decide "whether the government's classification is correct, both independently and in comparison with the importer's alternative."  Marubeni America Corp. v. United States, 35 F.3d 530, 536 (Fed. Cir. 1994) (internal citations omitted).  Here, the undisputed evidence supports the Government's classification, as ABB's three–cable bundle fails to conform to the meaning of "assembled" in heading 8544 in both substantive terms (i.e., the physical features of the cables and the circumstances of the bundling process) and in terms of nomenclature (i.e., the terminology used by ABB and the industry to describe the cables and the bundling process).

### 1.        The Substantive Features of ABB's Cable Bundle

As noted above, the meaning of "assembled" in heading 8544 includes two components: (a) to have fit together (b) parts.  See supra Part I(A)(2).

The first component, "to have fit together" requires a relatively standardized procedure in which a minimum of discretion is exercised by the assembler.  The process by which ABB's cables were bound into a cable bundle was, in contrast, project-specific and subject to the discretion of those who oversaw the operation.  The intervals between each metal binding strap

were project-specific because they depended upon factors such as the speed of the cable laying vessel, the depth of the water, and whether the cables were "floated" as they reached the shore. Def.'s Stmt. of Facts at ¶34; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶34. Discretion was exercised in the bundling operation in that the strap intervals were determined on-site, Lindhe Dep., p. 88:L. 19 through p. 89:L. 7, were monitored visually, and were subject to alteration as conditions warranted. See VDS Cable bv Project Quality Manual, Sec. 6.6.1, Def.'s Resp. Br., Ex. D ("The strapping interval will be 2 to 5 [meters] and can be changed according to the visual confirmation of the straps during touch down monitoring done by the [remote operating vehicle]").

The second component, "parts," does not include objects that are distinct and separate commercial entities. Bauerhin, 110 F.3d at 779; Willoughby Camera, 21 C.C.P.A. at 325. ABB's cables fail this test. Each of ABB's cables entered the country fully-manufactured, complete with external armoring to protect it from conditions on the sea floor. Pl.'s Resp. to Def.'s Stmt. of Facts at ¶¶ 9, 12, 13, & 15 (HVDC cables); id., at ¶¶ 16, 18, 19, 21 (fiber optic cable). Each also entered in a functional condition. Pl.'s Resp. to Def.'s Stmt. of Facts at ¶ 13 (HVDC cables); id., at ¶ 17, 19, 20 (fiber optic cable). As fully–manufactured, functional articles, the three cables could have been used in separate projects and still have been able to fulfill their respective functions. Def.'s Stmt. of Facts at ¶36; Pl.'s Resp. to Def.'s Stmt. of Facts at ¶36 (admitting that it would be possible for any one or all three of the cables to be unbound and used on other projects without further re–working at a manufacturing plant). ABB laid them in the trench together because it was more efficient, convenient, and accurate to lay them in a

bundle. Lindhe Aff. ¶17.[7] Each cable, therefore, bears the hallmarks of a distinct, separate

commercial entity rather than a part of a whole.

ABB claims that, despite the fact that it imported three fully–manufactured, functional

articles, its intent was to assemble the three cables into a submarine cable for burial under the

Long Island Sound. Lindhe Aff., ¶12. Even if the bundling procedure constituted an assembly,

an importer's intent, by itself, is an insufficient basis for classification:

> It is well settled law that merchandise is classified according to its condition when
> imported. United States v. Citroen, 223 U.S. 407, 414-15, 56 L. Ed. 486, 32 S.
> Ct. 259 (1911). If the rule were otherwise, not only could the same product be
> subject to different duty rates depending on its intended end use, but Customs
> would be flooded with affidavits or other evidence of differing intended uses.
> Moreover, Customs would have no way of determining whether the merchandise
> was actually used for its alleged intended purpose after importation.

Mita Copystar America v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (emphasis added).

More importantly—and contrary to ABB's contentions—fastening articles together for

efficient handling does not, by itself, constitute an assembly. To confuse this point is to miss the

distinction between "bundled" and "assembled." The verb "bundle"is defined as "[t]o tie, wrap,

fold, or gather together." The American Heritage Dictionary, 254 (3d ed. 1996). The term does

not require that "parts" be "fit together." Objects are commonly bundled together for more

efficient handling, but a person who gathers sticks in a forest does not "assemble" the sticks

---

[7] "Bundling is a more cost effective manner in which to bury undersea cables because it eliminates multiple cable laying and trenching operations . . . . If the cables are not bundled, and the Sea Spider attempted to lay three individual unbundled cables at the same time, there would be no way to control where the cables would fall on the seabed of Long Island Sound. Moreover, the individual cables would spread out such they would not lay side-by-side on the sea floor. Since the [remote operating vehicle] can not [sic] move the cables once they are deposited on the sea floor by the Sea Spider, it would be necessary to dig separate trenches for each cable which would result in three trips across Long Island Sound rather than one." Lindhe Aff. ¶17

merely by tying them together with rope so that they can be carried more easily.

The HTSUS does not miss this distinction:  heading 9001 lists both "optical fiber bundles" as well as "optical fiber cables other than those of heading 8544."  HTSUS 9001 (emphasis added).  By using the term "bundles" in heading 9001 but not in heading 8544, the statute displays a mastery of terminology that belies any suggestion that subheading 8544.70.00 encompasses "optical fiber cable bundles" as well as "optical fiber cables."  The court is unwilling to presume that, despite the absence of a reference to cable bundles in subheading 8544.70.00 and the use of the term "bundles" in a separate provision, Congress nevertheless intended to include cable bundles in subheading 8544.70.00.  See Lynteq, Inc. v. United States, 976 F.2d 693, 697 (Fed. Cir. 1992) ("if Congress had intended to include [the poultry feed preparation] or other preparations under subheading 3203.00.10, Congress could easily have done so . . . . Congress did not do so and we decline to act where Congress has not.").

### 2. The Nomenclature of Submarine Cable Bundles

That ABB's cables are separate articles rather than three parts of a single article is confirmed by the terminology used in the Cross Sound Project and the industry as a whole.  The Cross-Sound project literature, including several items produced by ABB, repeatedly refers to several cables in a bundle—rather than a single cable—when discussing the project.  See, e.g., "Cross Sound Cable Project, Connecticut–Long Island," Def.'s Resp. Br., Ex. F at 2 ("The two HDVC Light power cables and the fiber optic cable were laid bundled together to minimize the impact on the sea bottom"); "Cross Sound Cable Interconnector, Connecticut and Long Island, USA," Def.'s Resp. Br., Ex. E at 2 ("The cables were buried up to six feet into the sea floor");

"Project Quality Manual," Def.'s Resp. Br., Ex. D, Sec. 1.1 & 1.2 ("VDS Cable bv . . . has been awarded the contract for the installation of 2 HVDC power cables and 1 fiber optic (FO) cable by ABB High Voltage Cables between the locations Shoreham, NY and New Haven, CT"). The contract between ABB Power T&D Company, Inc. and TransEnergie U.S. Ltd. uses the term "cable system," not "cable assembly," and refers to two cable systems rather than one: "The Fiber Optic Cable System shall be routed and installed in the same trench as the HVDC Cable System." Def.'s Resp. Br., Ex. G, at I-60, Sec. 4.4, I-70, Sec. 4.10.2. The contract's technical specifications provide that the fiber optic cable will be "handled" and "installed" with the HVDC cables. Def.'s Resp. Br., Ex. G, at I-63, Sec. 4.8.1. The specifications do not provide that the three cables will be "assembled." See id. The Cross Sound Project's quality manual also speaks in terms of multiple cables: "All 3 cables, 2 HVDC + 1 FO, will be bundled by means of strapping the cables." VDS Cable bv Project Quality Manual, Sec. 4.1.2, Def.'s Resp. Br., Ex. D. The language used by the contracting parties involved in the Cross Sound Project refutes the proposition that they considered the cable bundle to be a single cable.

At a more general level, the submarine cable industry also conceives of a metal strapping operation as the "bundling" of multiple cables rather than the "assembly" of a single cable, as ABB's Project Installation Manager for the Cross Sound Project attests: "The process of combining the electric and fiber optic cables is called bundling, which is a standard industry practice world-wide. It is used on almost all cable laying operations where two or more cables are to be buried with the use of an undersea remote operating vehicle." Lindhe Aff. ¶13. An industry publication describing a submarine cable project at the Strait of Gibraltar exemplifies

this conception of multiple cables as individual articles rather than something conceptually

identical to a single-sheath composite cable:

> Two submarine optical fiber cables . . . were also installed along the route. . . .
> These cables were bundled to two of the four power cables. Separate fiber–optic
> cables were used, as the technology to include the fiber optics within the cable
> armor was not fully developed.

Ramon Granadino, Bridging the Strait of Gibraltar, Transmission & Distribution World, July 1,

1999, at 2, Pl.'s Op. Br., Ex. 5 (emphasis added). A technological or economic inability to

assemble a single, suitable composite cable does not mean that alternative measures, such as

bundling, constitute an assembly. Sources from the project and the industry confirm this by

referring to cable bundles as a collection of individual, fully–assembled articles.

Given the substantive aspects of the bundling operation, as well as the extensive

terminological references to the bundling of multiple individual cables, Customs properly treated

the HVDC cables and fiber optic cable as separate articles under subheadings 8544.60.40 and

8544.70.00, respectively.

## II.      THE SUBMARINE CABLES ARE NOT A COMPOSITE MACHINE

In an alternative argument, ABB contends that the cable bundle constitutes a composite

machine within the meaning of Note 3 of Section XVI, HTSUS, which provides that such

machines are classified "as if consisting only of that component or as being that machine which

performs the principal function." Note 3 of Section XVI, HTSUS. ABB asserts that the cable

bundle is a composite machine which "has no principal function." Pl.'s Op. Br. at 18. Where the

principal function of a composite machine cannot be determined, the Explanatory Notes indicate

that recourse should be made to GRI 3(c), which provides that the article be "classified under the

heading which occurs last in numerical order among those which equally merit consideration." GRI 3(c), HTSUS. Assuming application of GRI 3(c) were appropriate, this would lead to classification of the cable bundle under subheading 8544.70.00. Assuming that the HVDC cables no not provide the principal function, this argument hinges on whether the cable bundle is a composite machine.[8] For reasons similar to those stated in the previous section, it is not.

Composite machines "consist[] of two or more machines fitted together to form a whole and other machines designed for the purpose of performing two or more complementary or alternative functions." Note 3 of Section XVI, HTSUS. The Explanatory Notes elaborate, describing composite machines as "consisting of two or more machines or appliances of different kinds, fitted together to form a whole, consecutively or simultaneously performing separate functions which are generally complementary and are described in different headings of Section XVI." Explanatory Notes at 1387. The phrase "fitted together to form a whole" is nearly identical to the meaning of "assembled" in heading 8544. See supra Part I(A)(2). The Explanatory Notes to Note 3 go even further, providing that two or more machines "should not be taken together to form a whole unless the machines are designed to be permanently attached either to each other or to a common base, frame housing, etc." Explanatory Notes at 1388. Because each of the cables is fully–manufactured and capable of functioning independently, the cables are not "designed to be permanently attached . . . to each other." Id. Thus, just as ABB's cables are not "fitted together to form a whole" within the meaning of 8544, they do not meet the requirements of the phrase within the context of composite machines within the meaning of

---

[8] Because the three cables are not a composite machine, the Government's counterclaim classification for such a machine, HTSUS 8544.60.40, does not apply.

Note 3 to Section XVI.

**CONCLUSION**

Because the three fully–manufactured, functional cables were fastened together after importation through a project–specific bundling process, they cannot be classified as the unassembled parts of a single fiber optic cable or composite machine.  Customs classified the cables properly as three separate articles.  Accordingly, ABB's motion for summary judgment is DENIED, and the Government's cross–motion is GRANTED.

JUDGMENT WILL ENTER ACCORDINGLY.

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated:  This 2nd day of September, 2004.
        New York, New York